*In re* MAINS.

ATTORNEYS—CHARGES AGAINST JUDGE—DISBARMENT.

For an attorney-at-law to spread upon the records of the court, in support of a motion that the judge of another circuit be brought in to preside in a case against him, an affidavit containing charges of conspiracy and corruption on the part of the circuit judge and the attorneys for the plaintiff, for which charges there is no foundation whatever in the facts, is just ground for his disbarment.

Petition by Clement Smith, circuit judge of Calhoun county, to have the name of Charles R. Mains stricken from the roll of attorneys. Submitted, on testimony taken in open court, October 18, 1899. Order of disbarment entered November 2, 1899.

*Horace M. Oren*, Attorney General, *Wanty & Knappen*, and *Philip T. Colgrove*, for petitioner.

*Charles R. Mains* (*Allen B. Morse*, of counsel), *in pro. per.*

MOORE, J. This is a proceeding brought to have the name of respondent striken from the roll of attorneys because of his having made upon the records and files of the circuit court of Calhoun county charges of corruption and conspiracy on the part of the circuit judge, which charges were well calculated to bring the court into disrepute. The case has been tried here in open court, where every opportunity has been given to the respondent to show the truthfulness of his charges, and to show why he should not be disbarred. The papers filed in the proceedings and the testimony are too voluminous to make it practicable to do more than state enough of what is shown to give a proper understanding of the situation. The proceedings show that the respondent is an attorney-at-law, and a

member of the firm of Mains & Cavanagh. He was also
one of the defendants in a suit at law in the case of the
Consolidated Steel & Iron Company against John Mains
and others, in which case the plaintiff claimed that the
defendants were indebted to it in the sum of upwards of
$3,000. The firm of Hulbert & Mechem were the attor-
neys for the plaintiff. Upon the trial of that cause before
Judge Smith, the respondent swore that he had paid the
amount of upwards of $3,000 to Mr. Hulbert, and produced
a stipulation which recited that the money had been paid,
and provided for a discontinuance of the suit. This stip-
ulation purported to be signed by Hulbert & Mechem.
Mr. Hulbert denied that any money had been paid to him,
and claimed that the signature of Hulbert & Mechem was
a forgery, and that the production of the paper and the
testimony of the defendant were a surprise to him. The
plaintiff was not prepared then to meet the situation, and
submitted to a nonsuit, with leave to move to set the
same aside. During the session of the court, but just
after it adjourned, while Judge Smith was yet upon the
bench, Mr. Nichols—a friend of long standing—stepped
up in front of the bench, and had a brief conversation
with the judge. The judge on this hearing testified that
Mr. Nichols did not refer to Mr. Mains or his litigation.
Later a motion to set aside the nonsuit was entered, when
Mr. Mains sent to the circuit judge this remarkable letter:

"BATTLE CREEK, Mich., 2/26/98.
"Hon. CLEMENT SMITH,
         "Hastings, Mich.
    "*Sir:* You are undoubtedly aware of the fact that a
motion to set aside the nonsuit in the case of the *Consol-
idated Steel & Iron Co.* v. *John Mains et al.* has
been entered, and will be heard before the circuit court of
this county. We are preparing evidence or showing to
be made against this motion, and in relation to this show-
ing we address you, as evidently, from the statements
we already have and affidavits we are getting, it will be
necessary to have your affidavit on the following points:
(1) What was the date that you were first apprised by the
plaintiff or its attorneys, or any one of them, that a non-

suit was to be submitted to, and by whom suggested, and in whose presence, and at what place? (2) Upon what subject was the Hon. E. C. Nichols interviewing you in the court-room, alone, after adjournment, in the evening, a day or two before the case was disposed of? Kindly be specific, as this matter is a proper subject of inquiry, and one we want to know. (3) Is it true that before the trial of this case commenced, or about the day of the opening of the trial, that you sent word through Loren Palmer, or any other person, to Mr. J. M. Powers, that you hoped he wouldn't take part in this case until he was fully satisfied that he was right, or anything in substance to that effect? If so, state your explanation in regard to the matter fully. (4) Is it true that you have in any way given assurance to O. S. Clark, or to Hulbert & Mechem, or any of them, or any one for them, that, if they could extort a confession out of the witness Mrs. Gifford, that she would be protected from prosecution,— that you would so protect her,— or have you given any one so to understand?

"We hope you can outlay this information, so we can prepare, and forward to you for your signature, an affidavit covering the points fully, and hope to have your reply by return mail.

"Yours truly,
"MAINS & CAVANAGH."

Instead of doing as most judges would, Judge Smith sent a kindly and courteous reply to each of the questions contained in the letter, and said, as the motion must be heard before him, it would not be in good taste for him to make an affidavit. Not content with the statement of the circuit judge, Mr. Mains sent him another letter, in which he insisted that another judge should preside in the case. Among other things stated in the letter is the following:

" The suggestions here offered are based upon the fact that the writer of this letter considers that the proceedings thus far in this case are but a beginning of what will follow, and that bitterness and ill-will will result from the trial of the cases growing out of it is just as natural and inevitable as that the case will be tried; and this litigation, in the form in which it is now getting, is reaching that stage where others are going to be affected by it, and a good case—it seems to us a very proper case—for the judge

located right in our circuit to let some one else try. I am not in a position to explain to you more fully the reasons for the suggestions offered, nor do I expect you would care to have me,—in fact, I have reasons that I wouldn't explain to any one; and one can hear almost all kinds of rumors on the streets of Battle Creek; and most all kinds of proceedings are being undertaken at the present time to make a defense in this case,—proceedings that, unless great caution is exercised, will certainly involve others, and we shouldn't want it to involve any one that shouldn't be involved; and we say to you frankly that we don't want you to hear this motion on the question of setting aside this nonsuit."

Growing out of his testimony in relation to the stipulation already referred to, Mr. Mains was later charged with the crime of perjury. Later he was charged with an attempt to abduct and murder Mr. Hulbert. The examining magistrate required him to give bail in the sum of $10,000 in the perjury case, and $20,000 in the other case. An application was made to Judge Smith to reduce the amount of bail in these cases, and he declined to do so. Later, Mr. Mains made a motion that another judge be brought in to try the perjury case. In support of this motion, he filed, without the knowledge and approval of his attorneys, a brief and affidavit made by himself, consisting of upwards of 30 pages of closely typewritten matter, charging the judge with acts which, if true, ought to put him behind prison bars. He charged him, among other things, with unjust prejudice, with unfair rulings, and mentions what his defense in the case was, and says that, in order to defeat him, one of his witnesses (Mrs. Gifford) was bribed:

"That the same man who backed up, with his money and his promises, two separate, independent attempts to bribe said Mrs. Gifford, made two, if not more, secret visits to the judge of this court during the pendency of said trial, and this defendant will insist and urge before the jury in this case that said visits were for a corrupt purpose, and the purpose was accomplished, and the cause of the accomplishment of said purpose is the reason for

the outrageous, persistent, continued illegal and unlawful rulings and actions made by the said Clement Smith, and persisted in by him; and affiant alleges that he believes that he can establish in part the truth of this charge by letters written by said Clement Smith himself. * * * Affiant further says that on the trial of this cause he will introduce evidence and show that said Clement Smith has either expressly or impliedly promised said Hulbert, O. Scott Clark, and others assisting him, that he (Smith), by virtue of his position as circuit judge, would protect from criminal prosecution any witness that had then testified for Mains who would change his or her testimony against him, and this whether it was true or false."

He states that a plot was formed to have him falsely charged with an attempt to commit murder, and that—

"Said diabolical plot was a malicious, vindictive, corrupt concoction by Steven S. Hulbert, aided and assisted in by Andrew W. Lockton and William G. Howard and others; and the details of said plot involved the breaking into the office of this defendant for the purpose of stealing and carrying away the stipulation and check that make most convincing and condemning proof against said Hulbert in the perjury case, and to get said defendant in jail, in order to get control of his witnesses, and by fear and threats and bribery, if necessary, get said witnesses to change their evidence and swear for said Hulbert, and crush and ruin and convict the defendant; and the details of said scheme involved the arrest of this defendant, and the placing of him under bonds so high that he couldn't reach them, and to secure—this defendant says that they did secure—the assistance and co-operation of Harry P. Lewis and Clement Smith, by unlawful and corrupt means, to accomplish that very end, as he will attempt to show on the trial."

His affidavit also contained this statement:

"Affiant further says that affidavits to support the allegations of this affiant could be gotten, with considerable expense, and requiring a great deal of time; but this defendant alleges that for him to be required to come in this court on such an application, and present to the people by whom he would establish each of these facts, would be greatly to the prejudice and detriment of the defendant in any case, and especially in this case, owing to the fact

that by the express consent of the prosecution, we believe, backed up by the circuit judge of this court, as soon as it is known that a witness intends to testify for this affiant, a concerted, deliberate attempt is made to either bribe, force, bulldoze, or drive said witness out of making any statement, or put him in such fear that he won't make a statement."

Not only was there no testimony tending to show that Judge Smith was corrupt, or that he had been a party to a conspiracy, or had indulged in any improper practice in connection with this litigation, but the record discloses a degree of patience and forbearance upon his part towards Mr. Mains, such as no judge ought to be required to exercise towards any attorney. His actions can all be explained upon the theory that he was attempting, without fear and without partiality, to intelligently meet and discharge his duty, under a combination of circumstances which made it exceedingly unpleasant for him to do so. No act of his is shown which ought to or would have excited even a suspicion of improper conduct in a morally healthy mind. It very clearly appears from the conduct of Mr. Mains, from his letters to the judge, containing unjust insinuations and covert threats, and from his brief and affidavits filed in the records of the court, that he has incorrect ideas of the relation existing between an attorney and the court, and is wholly without that moral sense which enables him to properly appreciate the duties and responsibilities, not only to the court, but to the public, growing out of that relation.

Fortunately, the conduct of attorneys is generally of such an excellent character that applications for disbarment are very infrequent. While the cases are not numerous, the right of the court, when it becomes satisfied an attorney is no longer a fit person to practice the honorable profession of the law, to strike his name from the rolls, is well established. It is important to an attorney that his right to continue his profession should not be taken from him, but, on the other hand, he has no right to so conduct

himself as to dishonor his profession or bring the courts into disrepute. Weeks, Attys. § 80, states the law to be as follows:

"As an attorney-at-law is an officer of the court, the latter may exercise its summary jurisdiction over him to the extent of depriving him of his office and striking his name from the rolls. This the court may do in cases of malpractice, though the offense be not indictable. Attorneys may forfeit their professionable franchise by abusing it, and a power to exact the forfeiture must be lodged somewhere. Such a power is indispensable, to protect the court, the administration of justice, and themselves. Abuses must necessarily creep in, and attorneys themselves are vitally concerned in preventing the vocation from being sullied by the misconduct of unworthy members. The court, too, has this power on the ground of self-protection, outside of the common law, and outside of the statutory doctrine of contempt, in cases where an attorney has shown himself unfit to be one of its officers; and such unfitness may be displayed, not only by moral delinquency, but by acts calculated and intended to injure the court."

See, also, 1 Am. & Eng. Enc. Law, 944; *In re Gates*, (Pa. Sup.) 2 Atl. 214; *In re Eldridge*, 82 N. Y. 161 (37 Am. Rep. 558); *In re Wool*, 36 Mich. 299; *In re Shepard*, 109 Mich. 631.

Such conduct as that of Mr. Mains, if overlooked, would soon bring the bench and the bar of the State into disrepute, and confidence in the impartial administration of justice would be destroyed. The duties and powers confided to attorneys-at-law are of exceeding importance. They are officers of the court, and upon their competency and honor depends, in a large measure, the administration of justice. A disbarment proceeding is not simply for the purpose of punishing the offending attorney, but it is to aid in securing a proper administration of the law. As was said by Mr. Justice HOOKER in *Re Shepard, supra:*

"This is not a proceeding by way of punishment, though the deprivation of the privileges of an attorney may be a matter of serious importance to a practitioner.

121 MICH.—39.

It is a measure necessary to the protection of the public, who have a right to expect that courts will be vigilant in withholding, and, if already given, withdrawing, their certificates of qualification and character upon which the public rely."

An attorney ought not to be disbarred unless the duty of the court is very clear. We are not unmindful of the fact that an attorney is privileged to go great lengths in the defense of himself or his client in proceedings in court, without being held responsible out of court for what he has said or done in court; but this privilege does not carry with it the right to charge fellow attorneys and the presiding judge with conspiracy and corruption, when there is no adequate basis for such a charge. The law is tersely stated in *People* v. *Green*, 9 Colo. 506:

" Neither the letter nor the spirit of the attorney's privilege permits him to enter our courts and spread upon judicial records charges of a shocking and felonious character against brother attorneys, and against judges engaged in the administration of justice, upon mere rumors coupled with facts which should of themselves create no suspicion of official corruption in a just and fair mind. And although, in actions of libel and slander, it has been thought wise to exempt them from liability for defamatory words published or spoken in the course of judicial proceedings, provided such words are material, in a disbarment proceeding the recognition of such a privilege could neither secure justice nor advance the independence of the bar. On the contrary, its inevitable tendency would be to destroy the respect due to the profession as well as to the bench, and cripple the influence and usefulness of both."

A pathetic appeal has been made to us by Mr. Mains to spare him because of his wife and his boys. We deeply sympathize with them, but such a plea ought not to have weight in a court of justice. Wife and children should be an incentive to an honorable career, but they ought never to be used as a shield to protect a man from the natural consequences of his own acts.

The action of Mr. Mains is entirely inexcusable. We

think he has shown himself devoid of that sense of honor which is essential to the proper discharge of the duties of an attorney and counselor at law and solicitor and counselor in chancery. It is ordered that his name be stricken from the rolls, and that he be disbarred from practicing in any of the courts of this State.

The other Justices concurred.