## *In Re* WILLIAM G. TROY.

### DECEMBER 8, 1920.

PRESENT: Sweetland, C. J., Vincent, Stearns, Rathbun, and Sweeney, JJ.

(1)   *Attorney at Law.   Unprofessional Conduct.*

On charge of unprofessional conduct against a member of the bar, evidence considered and respondent found guilty of gross official misconduct, in making false charges maliciously against the integrity of justices of the court and respondent disciplined.

The facts upon which this matter came before the Court are fully stated in the opinion.

SWEETLAND, C. J.   Information came to the knowledge of the court tending to show unprofessional conduct on the part of William G. Troy, an attorney and counsellor of this State.   Upon preliminary examination said information appeared to be so reliable as to require that action should be taken by us; whereupon a minute was entered upon our records setting forth that it had been brought to the attention of the court that at a public meeting in the city of Woonsocket in the presence of a large number of the citizens of the State the respondent had alleged that certain if not all of the justices of this court had obtained and now hold their offices as the result of disreputable and corrupt methods employed in their respective elections; and that said Troy publicly in an address delivered by him at that time and place made use of language substantially as follows: "Seats on the Supreme Court of this State are a matter of barter, b-a-r-t-e-r" "in plain words are bought and sold" "Who paid money, how much was paid and who got the money at the election of the last Supreme Court Judge?"

On said minute a rule was entered upon said Troy requiring him to appear and show cause why he should not be adjudged in contempt and why he should not be subjected to discipline as an officer of the court.

We wish to say at the outset of this opinion that without passing upon the question of whether or not the alleged conduct of the respondent, if established, would amount to contempt for which he should receive punishment, we have treated the matter solely as it relates to the respondent's official character as an attorney and counsellor of this court, and our final determination is based entirely on that consideration.

The respondent appeared accompanied by counsel and presented his written statement under oath in which, among other things, he sets forth that on the 26th day of October,

1920, he did address a Democratic campaign meeting in the city of Woonsocket in which address he advocated the election of the State judiciary by popular election rather than by the General Assembly as now provided by law; but that in said address "no reference was made to the election of members of the Supreme Court as at present constituted or ever constituted"; that "the only reference made was to the election of a member of the bench of the Superior Court to fill an expected vacancy therein"; and further that "said Troy denies the allegation that at said meeting of the said electors he made use of this language substantially, to wit.: 'Seats on the Supreme Court are a matter of barter' or proposed the question, 'Who paid money, how much was paid and who got the money at the election of the last Supreme Court Judge?'" The respondent also was sworn and testified that at said meeting in Woonsocket he did not use the language quoted above; that he made "no reference to these five gentlemen here," and further testified, "I did not and would not have the people of Woonsocket or the people of this country or of this State for that matter, believe that I knew or would charge that any man from the district court to this supreme court corruptly obtained his election. I say if any unfortunate conclusion has been drawn it isn't as a result of what I said."

Because of the explicit denials of the respondent contained in his written statement and in his testimony given upon the stand we required the Providence Journal Company to appear and present evidence as to the truth of the statements published by it in the Providence Daily Journal concerning the conduct and language of the respondent at said public meeting in Woonsocket. In conformity with said order the Providence Journal Company appeared and presented the testimony of nine persons who were present at said meeting. The respondent was permitted to fully cross-examine said witnesses. He also presented the testimony of ten other persons who were present at said meeting and the respondent himself testified further in his own behalf.

At said second hearing John R. Hess, Jr., testified that he was a reporter employed on the Providence Daily Journal; that by the direction of the city editor of that newspaper he attended said meeting in Woonsocket and made a report of the same for publication; that he took notes of the speech of the respondent which notes he had with him in court and used for the purpose of refreshing his recollection. These notes were offered in evidence but upon the objection of the respondent's counsel said notes were not received in evidence. Mrs. Dorothy O'Leary Hess testified that she accompanied Mr. Hess to said meeting and took notes of the address there delivered by the respondent. She also produced her notes in court and they were offered in evidence but upon the objection of the respondent they were not admitted, although the witness was permitted to use them to refresh her recollection in so far as she needed them for that purpose. The testimony of Mrs. Hess corroborated that of Mr. Hess as to the language used by the respondent with reference to the members of this court and as to their election. Each of these witnesses was subjected to a searching cross-examination by the respondent's counsel. It appeared to the court without question that the witnesses were frank and candid and that their testimony was fully entitled to belief. From the fact that they went to this meeting for the purpose of reporting it and did take notes of the speech of the respondent, and as we are convinced of their intelligence and honesty, we must regard their testimony as furnishing the most reliable evidence concerning the language used by the respondent on that occasion. Upon a very careful examination of all the evidence given at the hearing we do not find that the testimony of these witnesses is contradicted in an essential particular by any of the witnesses presented by said Journal Company or by the respondent. Furthermore every statement made by the witness Mr. Hess is corroborated in substance by one or more of the other witnesses including some of those presented by the respondent; and the respondent himself when

upon the stand at the final hearing, in spite of his explicit denial made at the first hearing, admitted in substance all of the essential statements made by the witness Hess, only urging that his language should receive an interpretation in accordance with what he now claims he intended when he employed it.

It appears from the testimony without contradiction that at said meeting the respondent with an ill-mannered characterization of the members of this court said, "These five individuals sitting in the Court House on Benefit Street had the colossal nerve to decree that the men fighting in the trenches had not the right to vote." The respondent's intention was plainly to cast discredit upon this court by an unfair and incorrect reference to the opinions of this court given in response to questions of the Governor, 41 R. I. 118 and 209. We have not however in this proceeding called the respondent to account for the public statement of his opinion with regard to the physical characteristics of the members of this court however expressed, nor for his criticism of the decisions of this court although such criticism manifestly was not made in good faith but with a wilful intent to misrepresent the position of this court upon a matter of public interest. We only refer to the characterization and quoted statement because they contradict the respondent's claim that his reference was not to the members of this court but to the justices of the Superior Court, and because they indicate the animus of the respondent in that portion of his address to which we shall now refer. The respondent further said, "Seats on the Supreme Court of this State are a matter of barter, in plain words are bought and sold. Who paid the money, how much was paid and who got the money at the election of the last Supreme Court Judge?" The respondent claims that he did not speak of "seats on the Supreme Court" but his reference was to "seats on the Superior Court." This claim is discredited by his prior language to which we have just referred and is explicitly contradicted by the testimony of a number of

witnesses including some of those presented by himself.
The respondent further claims that in making this statement
he did not intend that his audience should understand him
to charge that any justice of either the Supreme or Superior
Court had obtained or holds his office as the result of dis-
reputable or corrupt methods employed in his election. The
respondent, like every other man, must be held to intend
the ordinary meaning of his words, and unless he limits or
restricts it his language must be taken in the sense in which
it appears to have been used and as it naturally would be
understood by those who heard it. We wish to judge the
respondent fairly in this matter and to resolve every reason-
able doubt in his favor. We have carefully considered this
language and while the ordinary meaning of the word
"barter" does not convey the notion of purchase by the
payment of money, the natural signification of a charge
that a judicial officer has obtained his position as the result
of barter is that of the allegation of a corrupt and dis-
reputable transaction. Without restriction, explanation or
modification the respondent has asserted that seats on this
court are a matter of barter. That his auditors might have
no uncertainty as to his meaning he added, "in plain words
are bought and sold." The natural and ordinary meaning
of the words "to buy" and "to sell" is on the one hand to
obtain and on the other to deliver some thing for a price,
usually in money. The respondent further claims that the
word "money" was not used in the concluding question
propounded by the respondent and quoted above. Mr.
Hess and Mrs. Hess in connection with this question have
the word "money" in their notes. The respondent says
that referring to the last election of a judge, his question
was "How much was paid and who got it?". Taken in
connection with the context the inference naturally to be
drawn by his hearers seems to us to be no different whether
the language used was as it appears in Mr. Hess's notes or
as it remains in the respondent's memory. A number of the
witnesses do not recall that the word "money" was used by

the respondent in this question but remember that his direction was to his hearers to ask the Republican members of the General Assembly, as one witness testified, "Who got it and how much was paid?", and as another testified, "Who paid, how much and who got it?" As showing the understanding of his auditors it is in testimony that one of the witnesses at this point in the respondent's speech asked a Republican member of the General Assembly who was standing beside him at the meeting, "How much did you get?".

We are forced to the conclusion that the respondent intended his hearers to believe that the members of this court had purchased their respective positions by the payment of a price to the members of the General Assembly. This intention is particularly apparent in the respondent's reference to the justice last elected.

At the hearing the respondent and his counsel in the presentation of testimony and in argument laid great stress upon what they appeared to regard as matters of vital importance, viz.: that whatever the respondent may have said concerning the election of judges related to members of the Superior Court and not to the justices of this court, and furthermore that the respondent's statements did not purport to be made upon his own authority but upon that of another. We find both of these contentions of the respondent to be false in fact; if however they appeared to be true they can not avail the respondent as matters of defence. This point we will now consider.

The charge against the respondent is that of unprofessional conduct. We are called upon to determine whether his conduct has been such as to indicate that the license granted to him has been unworthily exercised and whether he is fit to continue as a member of the bar and as an officer of the courts of this State. Such unfitness would equally be shown by proof of a false charge maliciously made against the integrity of the justices of either court. A calumny of that character, if believed, would tend to weaken the

authority of the court against whose members it was made, bring its judgments into contempt, undermine its influence as an unbiased arbiter of the people's rights and interfere with the administration of justice.    The cases are numerous in which courts having authority over admissions to the bar and having the power of disbarment have not hesitated to discipline attorneys for false and unwarranted attacks upon the integrity of inferior courts, and judicial officers.    *Matter of Rockmore,* 127 App. Div. 499; *In re Thatcher,* 190 Fed. 969; *In re Mains,* 121 Mich. 603; *In re Adriaans,* 17 App. Cas. D. C. 39; *State ex rel.* v. *Maxwell,* 19 Fla. 31.

It appears from the testimony of all the witnesses that the respondent in the course of his reference to the members of this court alluded to what he asserted was a letter of the Honorable Chester W. Barrows, one of the justices of the Superior Court, which letter he claimed to hold in his hand but which he did not read.    It is not clear from the testimony exactly what was the connection between the statements of the respondent regarding the election of judges and his reference to this so-called letter of Mr. Justice Barrows.    Mr. Hess testified that the respondent said, "Ask Judge Barrows what he thinks of the courts of this state."    The respondent's testimony with reference to his use of this letter is somewhat contradictory, but he appears to claim that his reference to the election of judges was made upon the authority of the assertions of Judge Barrows contained in said letter together with some explanatory matter of his own in the nature of interpretation.    The effect of the testimony of a number of witnesses is that he used what he asserted were the sentiments of Judge Barrows contained in the letter for the purpose of giving confirmation to his own statements.    We have not the letter of Judge Barrows before us; but we have no reason to believe that Judge Barrows has charged that either of the justices of this court obtained his election by corrupt means.    Whether, however, he did or not make such charge, and whatever may have been the respondent's use of said letter, whether he

used it entirely as confirmation of his own statements, or made said statements wholly or partly as quotations from the letter, in the circumstances neither of those conditions will serve to exonerate the respondent, to palliate his offence nor to mitigate the disciplinary action of the court. At the beginning of these hearings the court informed the respondent and his counsel that full opportunity would be given to the respondent to establish the truth of his charges and he would have been permitted to present any evidence which in his opinion tended to prove the allegations made by him at said meeting. It was the desire of the court that if the respondent was possessed of information which might be a ground for even a suspicion in the public mind that either justice of this court had employed corrupt methods in obtaining his election it should be publicly stated that it might be publicly refuted. The respondent, however, declared under oath a number of times at the hearings "that he has no information as to the incidents attendant upon the election of any justice of any of the courts of this state," and further that he "has no knowledge and no belief that corrupt methods were employed in the election of the justices of any court in the state." It thus appears that at said meeting the respondent maliciously made his charges against the members of this court, either on his own authority or partly on his own authority and partly upon what he claimed was that of another, while he not only had no knowledge of their truth but a belief in their falsity; and further he sought to give added weight to these false charges by attempting to associate a reputable member of the Superior Court with himself in their assertion. It is an elementary principle that no one can avoid responsibility for defamatory words, which he believes to be false when he speaks them, by claiming that he is merely repeating the sentiments of another, although at the same time he gives the name of their alleged author. As to the derogatory reference in the concluding sentence of the language quoted, it is interrogatory in form, but the respondent's malicious

intent is as apparent therein and his responsibility is the same as it would be if the statement was positive. It appears that these false allegations of the respondent were not impromptu remarks made under the excitement of a political address but were deliberate and premeditated. The respondent carried with him among the documents which he intended to use at this meeting the so-called letter of Judge Barrows. It further appeared from the testimony of Arthur W. Eddy, a newspaper reporter, that he reported for the Pawtucket Times a speech that the respondent made in a public meeting held in the city of Central Falls four days before the meeting in Woonsocket. In said speech at Central Falls the respondent said that Judge Barrows declared that judgeships in this State are bought and sold. A report of the meeting in Central Falls, containing this language was published in the Pawtucket Times. The witness, Mr. Eddy, appeared to us to be entirely reliable and entitled to credit. We are convinced that the speech at Woonsocket was part of a campaign of false and malicious attacks upon the integrity of the members of this court and the judiciary of the State in general which the respondent had entered upon in a reckless attempt to excite popular prejudice against the courts as they are now constituted.

We find the respondent guilty of gross official misconduct. Upon receiving his license as an attorney and an officer of this court he undertook to be faithful to the administration of justice. He must be held to know that much of the good order of the community, the safety of the citizens and the security of property, depends upon the confidence that the people may justly place in the integrity of the judiciary, and in the impartiality of their decisions. If the feeling becomes implanted in the public mind that positions upon the bench are corruptly obtained by purchase the suspicion inevitably follows that the decisions of the court also may be the subject of purchase. Reliance is no longer placed in the fairness of such decisions and our government is weakened in respect to the very matter, to secure which the State, in a

large measure, was established, viz.: that the citizen might be secure in his liberty, his person and his property through the protection of law. Thus in maliciously attempting to instill into the minds of the people a distrust of the integrity of the court, as one of the co-ordinate branches of the government, the respondent has attacked the State itself. In *Bradley* v. *Fisher*, 80 U. S. 335, the court said, "the obligation which attorneys impliedly assume, if they do not by express declaration take upon themselves, when they are admitted to the bar, is not merely to be obedient to the Constitution and laws, but to maintain at all times the respect due to courts of justice and judicial officers." In the case of *Austin*, 5 Rawle, 191, the Supreme Court of Pennsylvania said: "To impair the general confidence in the purity and efficiency of the administration of distributive justice is a vital injury to it; and the attorney who abuses the public credulity with a view to that effect, cannot complain if the faculties from which his capacity for mischief is mainly derived, be taken away from him." In the *Matter of Rockmore*, 127 App. Div. 499, an attorney was suspended for serious reflections upon the judicial character of the justice of an inferior court. The court said of such acts that they tend "to subvert the confidence of the community in the courts of justice and in the administration of justice; and when such charges are made by officers of the courts who are bound by their duty to protect the administration of justice, the attorney making such charges is guilty of professional misconduct." *In re Snow*, 27 Utah, 265, was a proceeding for disciplining an attorney for false allegations reflecting upon the character of a justice of the Supreme Court of Utah as a judicial officer. The matter was very fully considered and the respondent was suspended. In that case the court said: "Such false and scandalous accusations, when made by a sworn officer of the court, whose duty it is to maintain the respect, honor, and dignity of the judiciary, is a scandal that must necessarily affect the courts, and has a tendency to degrade and bring into public

disrepute the entire judicial department of the State and thereby weaken its efficiency and destroy its usefulness." . . . "Accusations of so grave and serious a character when made against a judge in his official capacity, as was done in this case, by an attorney, must necessarily have a much greater influence on the public mind than when made in the heat of passion by some defeated and disappointed litigant, as the public has a right to, and many no doubt will, because of the attorney's position and his connection and affiliation with the courts and judicial officers, give credence to the charges however false and unjustifiable they may be." To the same effect see *People ex rel* v. *Green*, 7 Colo. 244; *United States ex rel.* v. *Green*, 85 Fed. 857; *In re Thatcher*, 80 Ohio St. 492; *In re Disbarment of Thatcher*, 83 Ohio St. 246; *In re Thatcher*, 190 Fed. 969, affirmed 212 Fed. 801, rehearing denied, 219 Fed. 173; *Cobb* v. *United States*, 172 Fed. 641; *In re Philbrook*, 105 Cal. 471; *In re Mains*, 121 Mich. 603; *In re Breen*, 30 Nev. 164; *Bar Commission* v. *Sullivan*, 35 Okl. 745; *Ex parte Cole*, 1 McCrary, 405; *In re Adriaan*, 17 App. Cas. D. C. 39; *State* v. *McClaugherty*, 33 W. Va. 250; *Johnson* v. *the State*, 152 Ala. 93; *State ex rel* v. *Maxwell*, 19 Fla. 31.

The respondent has sought to have it appear that his charges were only legitimate elaborations of an argument for the popular election of judges. From the testimony it seems more probable that they followed and were connected with his false statement concerning the opinions of this court as to the vote of soldiers who were in service without the State; but his official misconduct is in no way excused because it occurred in one branch of his discourse rather than in another. His offence consists in wilfully making false and malicious charges against the courts of which he is an officer.

It is within the right of every citizen, whether a member of the bar or not, to publicly advocate and by fair and legitimate criticism and argument to urge changes in our law with reference to any matter, including the election of the

judiciary. In so far as the respondent's address at Woonsocket was of that character we would not attempt to restrain him nor call him to account; and this opinion must not in any way be so understood. Because a man is a member of the bar the court will not, under the guise of disciplinary proceedings, deprive him of any part of that freedom of speech which he possesses as a citizen. The acts and decisions of the courts of this State, in cases that have reached final determination, are not exempt from fair and honest comment and criticism. It is only when an attorney transcends the limits of legitimate criticism that he will be held responsible for an abuse of his liberty of speech. We well understand that an independent bar, as well as an independent court, is always a vigilant defender of civil rights.

In many reported cases, courts, which have been forced to take disciplinary action against a member of the bar for false attacks upon the integrity and dignity of the judiciary, have referred to such action as a most unpleasant duty which the interests of the State demand; and we, equally with them, regret that the necessity has come to us to discipline an attorney for lack of fidelity to the administration of justice in this State. In Rhode Island the relation between this court and the members of the bar has always been unusually intimate and marked by mutual respect and friendliness. It cannot be otherwise than that the personal characteristics or the ability of judges may have been the subject of comment and criticism among members of the bar, and that at times the representative of a defeated litigant, in the disappointment arising from an unfavorable decision, may have condemned such decision with heat and vigor; but never before has this court been called upon to consider the case of an attorney who maliciously, deliberately and in a public manner has sought to injure or destroy the influence of the court and its authority. We have endeavored to consider this case with deliberation and with all the care of which we are capable. The members of the

court have no personal animosity towards the respondent. If they alone were concerned they might be content to let his opinion and his utterances pass as those of a malicious person unworthy of notice; but the rights of the public and the honor of the bar require us to act.

We are of the opinion that an order permanently removing the respondent from the bar would be justified and could not be regarded as too severe. It has, however, always been considered that the object of proceedings of this nature is the protection of the court, the bar and the public, and not the punishment of the respondent, although his discipline usually results in damage to him. In the past we gave to this respondent the privileges of a member of the bar. He has shown his unworthiness, and now we must take such action as seems to us to be fitting, not for his punishment, but that the possession of that privilege may not remain in unsuitable hands to the detriment of others. After finding an attorney guilty of official misconduct the courts have generally been inclined in fixing the order for discipline to give to the respondent the benefit of every consideration which could be urged in his favor and to make an order less severe than disbarment if there appeared a reasonable prospect that such more lenient order would accomplish the end desired. *Bradley* v. *Fisher*, 80 U. S. 335, at p. 355. What we are now to say is in no spirit of unfriendliness. We would not unnecessarily belittle nor degrade a man who stands before us in the position of this respondent. It should be regarded as a matter to be taken into consideration in his favor. We are convinced that he has encouraged in himself the habit of reckless and malicious speech; that, to attract attention to himself and astonish his audiences, he has resorted to exaggerations and even untruths; that having escaped liability up to this time he has been led by this immunity farther and farther beyond the limits of free speech, has lost the proper sense of responsibility, and now finds himself in his present unhappy situation. It may be said perhaps that these considerations clearly indicate that

the respondent is unfit to remain a member of a dignified and honorable profession. That would be true and conclusive if it were clear that the things we have named are permanent and unchangeable qualities. We shall take into consideration that for the first time in his life, probably, the respondent is brought fact to face with the consequence arising from the exercise of an unbridled tongue. If suspended he will have an opportunity for reflection and by good conduct to show sincere amendment. In a forcible way the lesson will be impressed upon him that hereafter he must govern his utterances to conform with truth; that free speech does not amount to a license to utter whatever of falsehood and malice may come to his mind and tongue, that an attorney has a duty and responsibility towards the administration of justice which he must strictly observe.

After mature deliberation we order that William G. Troy be entirely suspended from practice as an attorney and counsellor of law for the period of two years from and after the eighth day of December, 1920, and until further order of this court. If at the expiration of two years from the eighth day of December, 1920, it shall be made to appear to us that he has in all respects complied with this order of suspension, that he sincerely regrets his official misconduct, and that there is a reasonable prospect of proper behavior on his part in the future, we will consider a motion that he be reinstated as an attorney and counsellor at law.

*Joseph C. Cawley, John P. Beagan,* for William G. Troy.

*Edwards & Angell,* for Providence Journal Company. *Claude R. Branch, John W. Baker,* of counsel.