ATTORNEY GENERAL *v.* NELSON.

1. ATTORNEY AND CLIENT—DISBARMENT—UNPROFESSIONAL CONDUCT.
Attorney found guilty of unprofessional conduct is subject to punishment.

2. APPEAL AND ERROR—CERTIORARI—ATTORNEY AND CLIENT.
Appeal in disbarment proceedings is in nature of certiorari.

3. ATTORNEY AND CLIENT—DISBARMENT PROCEEDINGS—QUESTIONS REVIEWABLE.
On appeal in disbarment proceedings, which is in nature of certiorari, Supreme Court does not weigh testimony, but if proceedings were properly instituted, no substantial rights denied defendant, no prejudicial errors committed, and there is competent evidence to sustain order of trial court, it must be affirmed.

4. SAME—EVIDENCE—SUFFICIENCY.
On appeal in disbarment proceedings, order suspending defendant's license to practice law for period of one year, *held*, sustained by competent evidence.

Appeal from Wayne; Carr (Leland W.), Gilbert (Parm C.), and Bell (Frank A.), JJ., presiding. Submitted October 25, 1932. (June, 1932, Docket No. 150, Calendar No. 36,589.) Decided June 29, 1933.

Disbarment proceedings by Paul W. Voorhies, Attorney General, against Walter M. Nelson. From order of suspension, defendant appeals. Affirmed.

*Walter M. Nelson* (*Dale Souter, Frank W. Atkinson,* and *James I. Ellmann,* of counsel), for appellant.

*Paul W. Voorhies,* Attorney General, and *Paul G. Eger* and *John H. McPherson,* Assistants Attorney General, for appellee.

*Maurice Miller, Clyde L. Fulton, Mark L. Rowley,* and *J. Chas. Wood, amici curiæ.*

SHARPE, J.  Several petitions praying for the disbarment of the defendant, an attorney practicing law in the city of Detroit, were filed with the attorney general of the State.  They were presented by him to the circuit court for the county of Wayne. An order to show cause was thereupon issued and served upon the defendant.  He filed answers thereto in his proper person.  At the request of the attorney general an order was made, pursuant to the provisions of 3 Comp. Laws 1929, § 13584 *et seq.,* appointing circuit judges Bell, Gilbert, and Carr to hear the same.  After the submission of proof, these judges, hereafter referred to as the trial court, filed an opinion on October 14, 1931, holding that certain of the charges had not been sustained by the proofs; that as to some of the others the defendant was guilty of unethical practice, but, in view of the pendency of certain litigation, the hearing should be continued and additional proofs taken, if the parties so desired.  Such proofs were taken, and on April 19, 1932, the trial court filed an additional opinion, in which it found that the defendant had violated the requirements of reasonable practice and should be disciplined therefor.  Accordingly, an order was entered, reciting that the defendant "is guilty of unethical practices, and of conduct unworthy of an attorney at law," and suspending his license to practice for a period of one year from the first day of May, 1932, and disbarring him from practice during that time.  From this order he here seeks review by appeal.

In the petition filed by Emerson R. Boyles, deputy attorney general, it is charged that in the pleadings filed by the defendant in several of the circuit courts of the State the defendant has attacked the integrity of the circuit judges; that he has co-operated and conspired with one Lewis M. Dickens in a false attack upon the judiciary and the attorney general's department and prosecuting attorneys by allegations in petitions and pleadings filed in the courts and by letters sent to bondholders and others; that he caused a corporation, known as the Bay City Company, to be organized, and through it secured conveyances from bondholders of the property described in certain trust mortgages securing the payment of such bonds, and caused many of them to be recorded, thus placing a cloud upon the titles to the lands described therein for the purpose of deceiving such bondholders and obtaining their consent to the plans devised for forcing the trustee of said bondholders to reimburse said parties for the losses they had sustained.

In one of the opinions filed, after reviewing the proofs submitted, the trial court said:

"We hold Mr. Nelson is responsible for improper methods along the lines indicated. We hold that as regards all of the actions of the man Dickens, if Nelson did not himself inspire them he is chargeable with knowledge of what was done."

The relations between the defendant and Dickens had been intimate since about the first of January, 1927. In 1929 he had desk room in defendant's office, had the use of his stenographer, and had his mail sent to and the return address on his envelopes, 1438 Dime Bank Building, the office address of defendant. He paid no rent for the privileges so enjoyed. Dickens had received but a limited educa-

tion.  Many of the letters sent out by him to bond-
holders and others, and pleadings in suits in which
he appeared in person, hereafter particularly re-
ferred to, indicate clearly that they were prepared
by an attorney familiar with the use of legal terms.

At the time of the "financial crash" in 1929, many
people of moderate means, as well as others of
greater wealth, found themselves in the possession
of bonds secured by trust mortgages on real estate.
There was default in the payment of interest, and
many of the bondholders were "at sea" as to what
they should do to protect their investments.  Dickens
was the holder of a small bond, for which he had
been offered a bonus of two per cent. of its face
value, but declined to sell.  He and the defendant
conferred about the enforcement of the collection of
these bonds, and Dickens was appointed trustee by a
number of bondholders to protect their interests.
It is apparent from the statements and quotations
which follow that he and the defendant became sat-
isfied that the most effective way to accomplish their
purpose was to institute criminal proceedings
against Milton Strauss, who negotiated the bonds,
and some of the officials of the trust company (now
the Union Guardian Trust Company of Detroit),
which was named as trustee in the real estate mort-
gages securing them.  To that end Nelson prepared
a criminal complaint, charging Strauss with crim-
inal conduct in connection with the issue of a bond
to which Fred Osborn claimed he was entitled, and
delivered the same to Dickens, who, accompanied by
a young attorney named Hunter, who participated
in some of the later transactions, presented it to
Carl Smith, the prosecuting attorney of the county
of Bay, and asked for the issue of a warrant there-
on.  It appeared to the prosecutor that delivery of
the bond referred to in the complaint could be se-

cured by demand therefor, and this was done and the complainant apparently satisfied. The defendant, however, felt that his rights had been invaded in the settlement, and brought suit against the prosecutor. His right to recover was denied in the circuit court, and the judgment rendered was affirmed by this court. *Nelson* v. *Smith,* 258 Mich. 169. In his declaration defendant stated that he was ''at great expense of effort and labor on the part of himself and his associates in the said litigation.'' It does not appear that he had any associate other than Dickens. Osborn, the complainant, seems also to have been induced by the defendant to bring an action against the prosecutor, and it is conceded that this action was discontinued by him.

Demand was thereafter made upon the judges of the Saginaw circuit court to call a grand jury to investigate the alleged criminal acts of Strauss and the officials of the trust company, and denied. A similar demand was made upon the judge of the Bay circuit court, and denied. Much correspondence (hereafter particularly referred to) was had by Dickens with the attorney general of the State, in which criminal action was demanded. In the meantime, many civil actions were begun, based on the fraudulent actions above complained of, but it appears that so far no favorable decision has been reached therein.

The purpose of the attempted criminal prosecutions is disclosed by the following question put to and answered by the defendant:

''*Q.* Then you had hoped for a possible criminal prosecution, didn't you?

''*A.* No. What I had hoped for was the parties responsible for this would avoid loss to the bond-

holders and further litigation by cleaning this matter up with the bondholders. Of course, that is what I wanted.''

In the brief filed by him in this court in his action against Smith he stated that ''he proposed to supplement efforts on the civil cases by a prosecution for the crime as well,'' and ''plaintiff claims that due prosecution of Strauss for his crimes would require of his associates restitution to the defrauded citizens of Michigan.''

It is the duty of prosecuting officers to prosecute criminals, but such prosecutions should never be resorted to as an aid to the enforcement of civil liability.

''It is right that men should pay their debts, and not culpable for creditors to collect by legitimate means and methods; but making merchandise of the criminal law is not a lawful method.'' *Koons* v. *Vauconsant,* 129 Mich. 260, 263 (95 Am. St. Rep. 438).

''Criminal law is public law, and it is a perversion thereof to employ its power or threaten to do so in order to coerce a father-in-law into making a pecuniary adjustment of his son-in-law's defalcation. Even if the son-in-law is guilty and amenable to the criminal law, one wronged by his crime may not threaten employment of such public law to obtain a private pecuniary composition.'' *National Surety Co.* v. *McLeod,* 240 Mich. 360, 365.

Many letters were written by Dickens to the bondholders, making serious charges affecting the integrity of the judges and public officials. In one dated March 18, 1931, addressed ''to the investors of securities issued in the name of the Milton Strauss Corporation,'' and copies of which were

sent to the governor, attorney general, and his deputy, and apparently to all of his assistants, and to the members of the securities commission, and apparently to all of the directors of the Union Guardian Trust Company, he refers to the fact that in former letters he had made "charges of fraud against the Union Guardian Trust Company of Detroit, Michigan, and the thefts by its agents," and "that public officials have connived with Union Guardian Trust Company to make this fraud and theft possible," and that none of them "have voiced a protest." He therein invites a denial on the part of the persons to whom a copy of the letter was to be sent, and then states:

"This denial can only effectively be made by any one or group of the below-named individuals conferring with your attorney and counsellor, Mr. Walter M. Nelson, 1438 Dime Bank Building, Detroit, Michigan, and vesting in him the power to effect an adjustment of this whole matter to entirely free yourself, the trust company and the public officials from future hardship and conflict which can only mean the payment of the gross expense incurred and the damages fully satisfied to the satisfaction of your attorney and counsellor and the payment of your money and the adjustment of your claim through the bondholders' committee that you may be assured that you will be relieved from legal or any other entanglements whatsoever. However, if it is not reported to you through Mr. Nelson, the bondholders' committee, or myself that the officials and directors of the Union Guardian Trust Company and the public officials are willing to adjust and fully satisfy your claims the securities will be issued to you promptly. In this event it will be your duty to advise your family, your friends, and your associates of the condition that exists to save you and

them from like hardships and a repetition of this entire episode in the future.''

This letter was prepared in, and mailed from, defendant's office. He was at that time acting as attorney for the persons to whom it was addressed. The reference therein to him and the language employed clearly indicate that Dickens at least had his assistance in its preparation. Several thousand mimeographed copies of this, and some of the other letters hereafter referred to, were made, some of them in defendant's office, and were mailed by Dickens and some of the bondholders, and, as Dickens stated, ''they were well circulated'' throughout the State, and most of them had the Detroit address of Dickens printed thereon.

In a letter to the attorney general dated January 27, 1931, complaining that no criminal proceedings had been taken, Dickens says:

''Public officials in every branch of the government having notice of this fraud have betrayed the interest of the public.''

He then states that—

''The essential angles of this litigation can readily be seen from an examination of the pleadings in three cases''—

begun by defendant in the Bay circuit court, and further says:

''It has been so far impossible to obtain a trial in a civil case or a prosecution on the criminal side.''

In a letter dated March 12, 1931, addressed to the investors, Dickens alludes to the fact that some of them were apparently worried over the charges made by him in the circular letters. He then states:

"In answer I will ask you this simple question. Why would one as timid and cautious as myself place my signature to such letters as you have lately received? I wish to assure you that before the signing and mailing of these particular letters I first satisfied myself and had the assurance of a great many others that the proof I possess was more than adequate for a complete defense in the event of being attacked by those exposed."

In a letter to the investors dated July 25, 1931, in referring to one of the circuit judges, he says:

"This circuit judge either does not know right from wrong or he defiantly leaves himself open to charges of wilfull malfeasance and misfeasance in office and brazenly obstructs the administration of justice before the very eyes of his watchful constituents."

In a letter to the attorney general written on April 10, 1931, Dickens stated that—

"Nelson intended calling at your office while at Lansing on Tuesday of this week but after conferring with me and going over affidavits given us by bondholders calling at your office we concluded that it may be dangerous for an individual to confer with you and your deputies privately and alone,"—

and suggested that he had presented this matter "to the criminal division of the department of justice in Washington, D. C."

In a letter written by Dickens to the attorney general dated August 14, 1930, he incloses a copy of a letter written by Mrs. Belfry of Kalamazoo to defendant as attorney for the bondholders, and in one dated May 5, 1931, he informs the investors that it became necessary for himself and defendant to go to Washington in their interest and excuses the delay in the issue of the new securities for that reason.

In a letter to the investors dated June 6, 1931, and also addressed "to whom it may concern," he states that the frauds perpetrated upon the citizens have been "suppressed by the newspapers;" that defendant and himself—

"after diligent efforts opposed by public officers, particularly the attorney general's department, who has supervision over all county prosecuting attorneys of Michigan, and the inexhaustible wealth of the banks of Detroit, Michigan, succeeded in perfecting a plan to protect the investors in the Milton Strauss—Union Guardian securities."

In one similarly addressed, dated June 27, 1931, he states:

"If the attorney general of the State of Michigan would give out the facts known to him and act accordingly, the investors in these and other securities would receive every dollar of their investment."

In another, dated April 10, 1931, he states—

"that the trust companies possess the facilities which enable them to buy and bribe public officials so that justice cannot be had,"

and he therein also refers to a conversation had between the defendant and an ex-bank examiner of the State.

In a letter dated September 26, 1931, addressed as above, he states that—

"there appears to be an understanding among the public officers defending the trust companies that when one of the ring gets into difficulties the others will use whatever means possessed to rescue him,"

and requests every bondholder in Saginaw, Bay, and adjoining counties to appear in the Bay circuit court at 9:30 a. m. on October 10, 1931, "for the

696          263 Michigan Reports.          [June

protection of their interests." (This was a date set for the hearing of a motion in a case in which the defendant was to appear as attorney for certain of the bondholders.)

In a letter dated February 26, 1931, addressed to the investors and signed by himself as trustee, Dickens states:

"In conclusion, the plan referred to is a positive guarantee of the return of your money."

Written from the Detroit office of the defendant, their attorney, it is not to be wondered at that the investors accepted this statement as true and continued their support of him and the defendant in their after proceedings.

In August, 1930, Dickens filed an answer and cross-bill in his proper person to a bill of complaint filed by defendant in the Wayne circuit, in which Estella Skelcey was plaintiff and the Detroit Estates Corporation and others, including Dickens, were defendants. (256 Mich. 125.) It consists of nine typewritten pages, and the nature of the allegations and charges therein clearly show that it was prepared by an attorney of ability and experience. In it he states that he—

"has undertaken to furnish to said securities holders the information and service, legal and otherwise, necessary to protect their investments from destruction by the other defendants."

In it he attacks the integrity of the Wayne circuit judges, alleges that by duress exerted upon them—

"adverse orders were entered behind the back of the bondholders' counsel"

in certain cases; that—

"said judges acted upon information other than that obtained in the pleadings or open court,"

and that the fraud perpetrated upon citizens by the defendants was—

"with the apparent assistance of the judges of Wayne county."

The relief prayed for in his cross-bill was that "the plaintiff be given all of the relief in her bill of complaint prayed for," and "that this cause be assigned for trial to an outside judge."

The only person who apparently could have helped Dickens, if defendant did not, was Hunter, and yet Dickens testified that Hunter had never represented him in any matter.

If such fraud in the issue and sale of these securities had been committed by Strauss or the trust company as would justify a criminal prosecution, it could easily have been established by an attorney as able as the defendant in at least one of the numerous suits brought by him for that purpose. But we are forced to the conclusion that the purpose of bringing these suits and of Dickens in his correspondence with officials and the investors was to give such publicity to the claims in that respect as would force the commencement of criminal proceedings in the hope that those against whom complaints were made would settle with the bondholders rather than submit to the ignominy of a trial thereof. These civil suits were financed by the bondholders, who no doubt honestly believed that the advice given them relative thereto was such as they might in good conscience rely and act upon.

The deception practiced upon them is revealed in the letter from Dickens to them under date of March 5, 1931, in which they are addressed as "Dear Friends."

"Under ·date of February 26, 1931, I reported a plan of settlement would be disclosed in a few days. On Monday night, March 2, 1931, all purchasers of securities issued in the name of the Milton Strauss Corporation who live in Bay and Saginaw counties, Michigan, met in a body at Bay City, Michigan. At the close of that meeting this plan was put under way to be rushed to completion at the earliest possible date.

"The plan is as follows: New securities will be issued to substitute for the securities you now hold. This operation when completed results in each investor having a security of value in his hands which represents the full amount of his investment and will be a lien on the properties which were purchased with your .money and the profits thereof converted by Union Guardian Trust Company and Milton Strauss. Investors who exchanged their bonds for stock, particularly of Andrew C. Sisman Company, will be treated as though still having their bonds. Investors who have been fraudulently induced to exchange for equities in worthless lots will likewise be treated as still having their bonds. Investors being fraudulently induced to sell for much less than face value by Union Guardian Trust Company and its agents will be given a security in an amount equal to the difference between what was originally paid for such security and what was received therefor. This program covers every security issued in the name of the Milton Strauss Corporation, hence no investor is overlooked."

In this letter he asked those to whom it was sent to remit one dollar for every $100 of their investment towards the expense of litigation.

These investors held bonds secured by trust mortgages on certain properties in Detroit. The bottom had dropped out of the real estate market, and the properties could not be sold for the amount of the

bonded indebtedness. Several, perhaps many, of them had been bonded for more than their fair value at the time the bonds were issued and more than their value at that time. The purchasers of bonds may not only have been unfortunate in their investments, but may have been deceived by representations made to them. In the latter case they would have a remedy as in a case of fraud.

But it would seem that a moment's reflection should have satisfied them that no person could secure to them the issues of new securities to take the place of these bonds and thus benefit them. These bonds were secured by a trust mortgage. The trustee would be accountable to them for the faithful discharge of duty.

In a bill of complaint in the case of *Burroughs* v. *Bagwell,* filed by the defendant in the circuit court for the county of Bay, in chancery, it was alleged that the plaintiff had purchased certain first-mortgage bonds from the defendant Milton Strauss; that they were fraudulently issued; that she was induced by the fraudulent representations of the defendant Bagwell to exchange said bonds for a land contract, and that the value of the lands described therein was misrepresented, and in the prayer for relief it was asked that the exchange be canceled and that the defendants be required to place the plaintiff in *statu quo.*

In this bill it was also alleged:

"That for reasons of their own the attorney general's office of Michigan, the prosecuting attorney of Bay county, Michigan, and other prosecutors in the State of Michigan have failed to prosecute the persons criminally liable for said fraud and have for a long period of time 'passed the buck' one to the other."

This statement in part was doubtless based upon the letters written by Dickens and the replies received thereto. These charges, made against public officials, none of whom were named as defendants, had no place in such a pleading, and the only apparent purpose of inserting them therein was to hold them up to public derision and to create in the minds of the people a distrust of such officers.

As a part of the plan under which the bondholders were to be protected in their investments and were advised that "they would recover in full," Dickens executed a mortgage on certain property (to which his only title was a deed from the bondholders) without consideration to Alfred J. Brandimore for $650,000, and defendant as attorney for Brandimore began proceedings for the foreclosure thereof in the Wayne circuit court, in chancery. A temporary receiver was prayed for and Hunter was appointed, his bond being fixed at $100. Such action was taken by reason of the consent of Dickens thereto. On the petition of the owners of the property, this order was set aside by the trial court, and on appeal to this court his action was affirmed. *Brandimore* v. *Dickens*, 256 Mich. 128. No satisfactory explanation of this proceeding was given by the defendant.

We have set forth the foregoing at some length because in our opinion it justified the trial court in finding the defendant chargeable with the acts of Dickens and holding him accountable therefor. They were acting together for the bondholders, Dickens as their trustee and the defendant as their, and his, attorney. In his letters Dickens but enlarged upon the claims made by the defendant in some of the pleadings and briefs filed by him, as above noted.

As in our opinion the facts above stated support the finding of the trial court that the defendant was

guilty of unethical conduct in his practice as an attorney, we omit consideration of the other complaints made on which the order to show cause issued.

Attorneys are officers of the court. When duly admitted to practice therein they must make oath that they will faithfully discharge the duties pertaining to that office to the best of their ability. They have a right to assume that the judges before whom they practice are men of integrity, whose only purpose is to decide the questions submitted to them as law and justice may require. "To err is human." From error the judges are not immune. Errors committed by trial judges are subject to review in an appellate court. The opinions of this court are not free from error, as is evidenced by occasional decisions overruling those theretofore rendered.

An attorney owes devotion to the interests of his clients. He should be zealous in the maintenance and defense of their rights, and should be in no way restrained in the discharge of such duty by fear of judicial disfavor. But at the same time he should be at all times imbued with the respect which he owes to the court before whom he is practicing. It is of the utmost importance to the preservation of our system of government that our people have confidence in the integrity of our courts.

Courts generally recognize that the public, and this includes the attorneys, has the right to criticize their opinions, and such criticism, when fairly indulged in, does not subject an attorney to discipline by the court, but such criticism must not go so far as to attack the integrity of the judge who has rendered the decision. To permit such an attack to be made by an attorney in affidavit or pleadings filed by him, or in letters written and circulated by

his authority, would necessarily have a tendency to create a feeling on the part of the public that it may not rely upon the courts to administer justice and that it would better take the law into its own hands, and mob violence with all its detestable features may follow.

And what has been said relative to courts applies, though with perhaps less force, to other public officials. They are elected or appointed to serve the public. If guilty of malfeasance, charges may be preferred against them and they may be removed. There is no justification for an attorney to even countenance the making of such sweeping charges and innuendoes against the attorney general and his assistants and the prosecuting attorneys generally as appears in the letters quoted from and in the declaration filed by the defendant as plaintiff in the case of *Nelson* v. *Smith,* heretofore referred to.

A disbarment proceeding is not intended as a punishment inflicted upon an attorney as an individual, but as a measure necessary to protect the courts and the public officials of the State. If such conduct may be indulged in by an attorney of the ability and standing at the bar of the defendant, it—

"would soon bring the bench and the bar of the State into disrepute, and confidence in the impartial administration of justice would be destroyed. * * *

"An attorney ought not to be disbarred unless the duty of the court is very clear. We are not unmindful of the fact that an attorney is privileged to go great lengths in the defense of himself or his client in proceedings in court, without being held responsible out of court for what he has said or done in court; but this privilege does not carry with it the right to charge fellow attorneys and the presiding judge with conspiracy and corruption, when

there is no adequate basis for such a charge." *In re Mains,* 121 Mich. 603, 609, 610.

See authorities there cited, and, also, 6 C. J. p. 596 *et seq.;* 2 R. C. L. p. 1091 *et seq.,* and notes thereto.

The review here is in the nature of certiorari. The evidence submitted clearly sustained the finding of the trial court that defendant was guilty of unethical conduct. *Attorney General* v. *Lane,* 259 Mich. 283.

The order appealed from is affirmed, and as a stay of proceedings was granted it will become effective from the date of the order entered pursuant hereto.

BUTZEL, J. (*concurring*).   An attorney found guilty of unprofessional conduct is subject to punishment. *In re Mains,* 121 Mich. 603.   Zeal, conscientiousness, perseverance, and courage of one's convictions, so highly commendable when properly exercised in the interest of a client, do not consist of unprofessional conduct, vilification, and abuse of process.   The appeal in the instant case is in the nature of certiorari.   We do not weigh the testimony.   If the proceedings were properly instituted, no substantial rights denied respondent, no prejudicial errors committed and there is competent evidence to sustain the order, we must affirm it. *Attorney General* v. *Lane,* 259 Mich. 283.   An examination of the testimony, including that referring to *Brandimore* v. *Dickens,* 256 Mich. 128, convinces us that competent evidence was introduced to sustain the order.   For this reason we concur in the result.

CLARK, POTTER, NORTH, FEAD, and WIEST, JJ., concurred with BUTZEL, J.   McDONALD, C. J., did not sit.