In the Matter of RICHARD A. KNIGHT, an Attorney, Respondent.

First Department, May 8, 1942.

*John T. Cahill* of counsel, for the petitioner.

*Richard A. Knight*, respondent in person.

PER CURIAM. The respondent, Richard A. Knight, was admitted to practice as an attorney and counselor at law of the State of New York on November 16, 1925, at a term of the Appellate Division, Supreme Court, State of New York, First Department.

The Association of the Bar of the City of New York filed a petition with this court verified on December 24, 1941, which charged the respondent with misconduct and asked that such action be taken as justice may require. Respondent moved to dismiss the proceeding, alleging that it was improperly initiated. That motion was denied on January 19, 1942. A motion for reargument or for leave to appeal to the Court of Appeals was also denied on February 13, 1942. (263 App. Div. 943.) Respondent failed otherwise to answer the charges, or offer any testimony in his defense.

By order of this court dated January 31, 1942, Hon. Charles B. Sears, official referee of the Court of Appeals, duly assigned herein, was appointed referee in this proceeding to take testimony and report thereon with his opinion. The official referee has reported that in his opinion the evidence sustains each of the six charges of professional misconduct set forth in the petition and that the respondent is guilty of conduct prejudicial to the administration or justice.

The charges herein are the result of the respondent's conduct reflecting personal dissatisfaction with the administration of the estate of his father-in-law, Lewis Cass Ledyard, Jr. He claimed that the attorneys for the executor secretly deprived the estate of the sum of $500,000 due the deceased from what is referred to as the Oliver Payne trusts; that by a similar fraud the estate was deprived of an unspecified sum due from the Payne Whitney estate; that the sum of $250,000 was improperly paid out of the estate to settle a stockholder's action in which the deceased was named as a defendant.

He also contended that the estate was deprived of interest on $200,000 which sum was retained for more than fourteen months by the law firm of which the deceased had been a member; that the estate was deprived of any income from a sum in excess of

$5,000,000 which the executor permitted to remain uninvested for more than one year; that information respecting the estate and the management thereof could not be obtained from the executor and that an order authorizing the expenditure of $108,000 a year for the maintenance of the residence at Syosset, Long Island, to the possession of which the widow of the deceased was entitled under the provisions of his will, was improperly obtained.

The executor of Lewis Cass Ledyard, Jr., filed its first account in February, 1938, for the period from May 1, 1936, the date of testator's death, to December 1, 1937. The account included the settlement of the stockholder's action against the testator and others and also the maintenance of the Syosset residence. The respondent immediately entered upon an extensive series of court proceedings and made charges of fraud, perjury, subornation of perjury, misrepresentation and conspiracy. He moved to set aside the orders of the surrogate of Nassau county which (1) permitted the maintenance of the Syosset residence and (2) approved the settlement of the stockholder's action. He also filed objections to the account of the executor and moved to remove the executor. The surrogate took testimony on all these motions and on July 13, 1939, denied the motions and overruled the objections. That action was affirmed unanimously by the Appellate Division, Supreme Court, Second Department (259 App. Div. 892). Motions for reargument and motions for leave to appeal to the Court of Appeals were denied (259 App. Div. 1029). The Court of Appeals also denied leave to appeal (284 N. Y. 819).

While the accounting and other proceedings were still pending before the surrogate, Nassau county, the respondent made an application in the Supreme Court, Kings County, for an order disqualifying the surrogate from acting in any matter relating to the Ledyard estate. That application was denied on June 29, 1938, and the denial affirmed on appeal (*Matter of Knight* v. *Howell*, 255 App. Div. 983). Leave to appeal to the Court of Appeals was also denied (256 App. Div. 828). At about the same time the respondent moved, in Supreme Court, New York County, for an order to remove the executor. The motion was denied (*Matter of Ledyard*, 170 Misc. 365).

He then filed a complaint in the Magistrates' Court, First District, Manhattan, charging a vice-president of the executor with perjury and other crimes in connection with the affairs of the Ledyard estate. The complaint was dismissed. The respondent then instituted a proceeding in the Supreme Court, New York County, for an order of mandamus directing the district attorney of New York county to present the matter to the grand jury.

On June 13, 1939, that motion was denied. A second similar mandamus proceeding in the Supreme Court, New York County, against the district attorney of New York county was denied on January 28, 1941. An application to compel the surrogate of Nassau county to vacate his decree of July 13, 1939, overruling objections to the accounting and denying motions for other relief was ultimately entertained by the surrogate and denied by him on June 4, 1941. A third motion in Supreme Court, New York County, to remove the executor was also denied.

After the entry of many of the foregoing decisions by the several justices and judicial tribunals, the respondent unleashed vicious attacks upon jurists, public officials and attorneys who, in the performance of their duty, had refused to acquiesce in his conclusions. The six charges of misconduct set forth in the petition are based upon six communications published by the respondent.

The first charge is that the respondent, under date of December 10, 1940, wrote and published widely a letter addressed to the petitioner's Committee on Grievances; a copy of the letter and of a " Notice " published therewith were annexed to the petition as Exhibit A. The second is that the respondent under date of February 12, 1941, wrote and published widely a letter addressed to Governor Lehman, a copy of which was annexed to the petition as Exhibit B. The third is that under date of March 13, 1941, respondent wrote and published widely a letter addressed to the Presiding Justice of the Appellate Division, Supreme Court, First Department, a copy of which was annexed to the petition as Exhibit C. The fourth was that under date of March 18, 1941, respondent wrote and published widely a communication addressed " To the Members of the New York Bar," a copy of which was annexed to the petition as Exhibit D. The fifth was that under date of June 30, 1941, the respondent wrote and published widely a notice together with an affidavit sworn to by him under date of June 26, 1941, and filed in this court; a copy of such notice and affidavit were annexed to the petition as Exhibit E. The sixth was that under date of October 31, 1941, respondent wrote and published widely a letter addressed to a member of the bar of the State of New York, a copy of which letter was annexed to the petition as Exhibit F. It was specifically charged that in so far as these various exhibits referred to judges of the courts of the State of New York they constituted conduct prejudicial to the administration of justice.

On the hearings before the official referee the respondent did not appear. The petitioner called respondent's secretary, who testified that respondent personally dictated to her each of the

six documents annexed to the petition. She said she typed each of the documents and that the respondent then edited them. All were delivered to the printer, some being taken to him by the respondent in person. This witness said she saw the proofs of the letters when they were returned by the printer. Furthermore, at the direction of the respondent she sent a list of names and addresses to the printer with instructions that the various letters be mailed to the persons so listed. On occasions she mailed copies of letters to persons whose names and addresses the respondent provided. She said that in her opinion there were between 3,000 and 4,000 names on the list. She said she did not believe there were as many as 25,000, which was the number of citizens of this State to whom the respondent stated in his letter to the Governor he was mailing copies of his letter, Exhibit B, annexed to the petition.

It is unnecessary to name the judicial officers who were the subjects of respondent's vicious attacks. It is sufficient for the purpose of this opinion to state that in the documents annexed to the petition he characterized one as " an incompetent, mendacious and otherwise grossly dishonest judge; " referred to what he called the " gross official dishonesty " of a judge; he said a judge had found that an order had been properly made " as a matter of law, not to mention as a means of saving his own crooked skin." He also stated that the decision of one court was a disgrace not only to it but to the entire bench and the entire bar as it gave not only the executor of the Ledyard estate but " any other trust company with comparable influence in its jurisdiction a clear license to ignore the law and the rights of beneficiaries and to loot estates at will for the benefit of its directors, stockholders and attorneys with the positive assurance of complete impunity as long as it enjoys a judicial approval, the mystical concentration of which is impervious to the terrestrial lures of fact or law." He charged a court with " shameless and contumacious dishonesty " and " indecent behavior." He asserted that certain judges had turned their backs upon common honesty and their sworn duty. Referring to two judges he said: " For a year and a half, I have been denouncing these two low, skulking rogues from the house tops and to date neither of them has had the guts even to cite me."

The foregoing excerpts are a few samples of the abuse which the respondent has heaped upon judicial officers who have fearlessly performed their judicial duties and refused to be intimidated or coerced by him. The letters and affidavits referred to were deliberately widely publicized by the respondent, undoubtedly at considerable effort and expense to him. No useful purpose would be served by further publication of his statements. The imputation

of corruption and dishonesty renders it impossible for the most open-minded individual to characterize the vituperative attacks as fair criticism of the courts. The theme of all of his publications is a scandalizing of the courts in an attempt to bring them into public disrepute.

It is, of course, the duty of citizens, and especially members of the bar, to seek the removal from office of any judicial officer guilty of dishonesty or corruption. The charges made by the respondent against the judicial officers indicated would, if established, justify impeachment and removal from office of the persons named. The respondent is aware of the appropriate forum for such a proceeding. The means he has resorted to are an attempt to undermine judicial respect and the reputation of the courts and judges and are most unprofessional, being a violation of the first canon of the Canons of Professional Ethics, which covers the duty of a lawyer to the courts.

In *Matter of Murray* (58 Hun, 604 [opinion published 11 N. Y. Supp. 336]), where somewhat similar facts were before the court, it was said: " * * * This conduct is unprecedented and unprofessional. The charges are most serious in character, and would be attended with the gravest results if established. They should not therefore be entertained for a moment, except upon the most impressive evidence at least, and then only in the manner provided by law for the investigation of kindred accusations against judicial officers. These results impose the greatest and most scrupulous care even in an attempted impeachment of a judicial officer, and if a counselor of this court, disregarding that mode of procedure, makes the charge of corruption against an officer in his own court, while sitting in a case which he is investigating, his conduct is in the highest degree unprofessional and improper. If such a performance should be tolerated, when every presumption of law is against the truth of the accusation, the honor of judicial officers would be exposed to the malice or rage of disappointed attorneys whose evil inclinations, anger, or passion would thus seek its gratification. Unfortunately, perhaps, there are in our profession a few who chafe under an adverse decision, and indulge in utterances which they are only too happy to retract in cooler moments; and this class are unfortunate, it may be, in having adopted a profession which has its successes and failures, the latter arising doubtless more from the infirmities of human evidence than the uncertainty or variability of legal principles. Here the respondent for the oral declaration against the surrogate was given the opportunity to apologize, which he failed to do, and in this proceeding has given neither signs of regret at his conduct nor retracted, apologized,

nor stated anything in extenuation or in mitigation. The excitement caused by overzealous advocacy is not even urged as an apology for the unusual misconduct complained of, or any explanation of it given. On the contrary, the stubborn repetition of the charges confirms their utterance as deliberately and intentionally made, and, from the manner in which they were made, justifies the presumption of an improper motive. Indeed, the conduct of the respondent was and is so flagrantly subversive of law, order, and decorum that there can be no hesitation as to the consequences that must ensue in the absence of any mitigating circumstances. It was said in *Bradley* v. *Fisher*, 13 Wall. 355, that the obligations which attorneys impliedly assume, if they do not by express declaration take them upon themselves when they are admitted to the bar, is [are] not merely to be obedient to the Constitution and laws, but to maintain at all times the respect due to courts of justice and judicial officers. This obligation is not discharged by merely observing the rules of courteous demeanor in open court, but it includes abstaining out of court from all insulting language and offensive conduct towards the judges personally for their judicial acts. In that case the attorney was stricken from the roll for threatening with personal chastisement a judge who was presiding in a case then pending, and in which the counsel was engaged; and although it is not necessary, perhaps, to refer to it,— there being no doubt whatever upon the subject,— it was there declared that the power to remove attorneys from the bar is possessed by all courts which have authority to admit them to practice. * * *."

In *Matter of Bevans* (225 App. Div. 427) the court said: " In this and in other jurisdictions, the rule is well settled that an attorney who engages in making false, scandalous or other improper attacks upon a judicial officer is subject to discipline. (*Matter of Manheim*, 113 App. Div. 136; *Matter of Rockmore*, 127 id. 499; *Matter of Carrao*, 170 id. 545; *Matter of Murray*, 11 N. Y. Supp. 336; 58 Hun, 604; *Bradley* v. *Fisher*, 13 Wall. 335, 355; *Cobb* v. *United States*, 172 Fed. 641; *Thatcher* v. *United States*, 212 id. 801; *Matter of Mains*, 121 Mich. 603.) "

After due notice of the serious charges made against him, the respondent failed to answer and failed to appear either in person or by attorney at the hearings before the official referee and interposed no defense and offered no evidence in explanation or justification of his charges. He has taken the position that if the charges made by him are false he may be prosecuted in the courts having jurisdiction of criminal proceedings. The appropriate course to be pursued in that direction may be determined by those charged with the administration of the criminal law or by the victims of the

respondent's malicious attacks. We are here concerned only with the fitness of the respondent to remain a member of an honorable profession.

On the record before this court, we are of the opinion that the respondent is guilty of gross moral turpitude and is unfit to remain a member of the bar.

The respondent should be disbarred.

Present — MARTIN, P. J., TOWNLEY, GLENNON, UNTERMYER and DORE, JJ.

Respondent disbarred.