*282 CAVANAGH, J.
(dissenting). As the Attorney Discipline Board (ADB) has before explained, indeed, in the context of offensive remarks made by this very respondent,
[flew if any members of the Michigan judiciary will be cowed by such outbursts.... [0]ur system of justice is not put at risk if these statements are not censored. The public and the profession can express their revulsion at such crudity, while at the same time feeling pride in belonging to a society that allows its expression. If we write rules governing speech to quell such antics, then we will have truly lost our bearings. The judiciary is not so fragile. It is the First Amendment that needs protection. [Grievance Administrator v Fieger, ADB No. 94-186-GA, opinion issued September 2, 1997 (Fieger II).]
Such protection has been lost today. The majority not only decides a question not before it, but, more troubling, its erroneous conclusions mark a sweeping expansion of the Michigan Rules of Professional Conduct. This expansion precipitates serious constitutional implications and, despite the majority’s protestations to the contrary, does in fact impermissibly exalt the protection of judges’ feelings over the sanctity of the First Amendment’s guarantee of freedom of speech. Thus, I respectfully dissent.
I. THE ADB DID NOT DECLARE THE RELEVANT RULES OF PROFESSIONAL CONDUCT UNCONSTITUTIONAL, SO THE ISSUE IS NOT RIPE FOR REVIEW
Although this Court granted leave to consider whether the ADB can declare a rule of professional conduct unconstitutional, that issue is not ripe for review because the ADB did not declare a rule unconstitutional, a majority of the ADB did not opine that it had the authority to do so, and the ADB’s dismissal of the complaint against respondent was not premised on the purported unconstitutionality of a rule. Thus, the majority errs in addressing this question.
*283 In deciding respondent’s appeal, the ADB issued a splintered opinion. Three of the eight participating board members wrote that respondent’s conduct did not fall within the cited rules of professional conduct because the comments were not made “to” or “in” the tribunal. Framing it as an alternative basis for its holding, the lead opinion reasoned that the rules should be read narrowly to avoid constitutional problems. The lead opinion stated that even if remarks made outside the context of a pending case were actionable, the rules did not sufficiently inform a person “what statements might be deemed impermissibly discourteous or disrespectful by the Attorney Grievance Commission, or by a hearing panel, or this Board.”
Two members concurred in part and dissented in part. They wrote that the rules did encompass respondent’s statements, but the First Amendment protected his right to make those statements. The three remaining members dissented, opining that the rules were constitutional and that respondent violated them.
Thus, there is no need to answer the question into which the majority delves because the ADB neither declared the rules unconstitutional nor purported authority to do so. Rather, the ADB’s lead opinion first held that the rules did not cover respondent’s comments. Only then did it mention the constitutional aspects of the rules, but instead of declaring the rules unconstitutional, it merely held that because of the constitutional principles of free speech, the rules should be read narrowly. It then concluded that under a narrow reading, respondent’s comments did not violate the rules. Of course, this view did not garner a majority, and respondent was only vindicated because two of the five remaining board members believed that respondent’s comments were protected by the First Amendment. But *284 the trae disagreement between those two factions was over whether respondent’s conduct was even covered by the rales, not over whether the rales themselves were unconstitutional.[1] In other words, the rules survived the ADB’s decision — the board did not purport to invalidate them. As such, any opinion by this Court regarding the ADB’s power to declare rales of professional conduct unconstitutional is purely advisory in nature and outside the bounds of our constitutionally imposed duty.
Nonetheless, because the majority persists in issuing its statement on this matter, it is necessary to illuminate the error in the majority’s analysis, which analysis asserts that the ADB lacks the authority to render a rale unconstitutional. In carrying out our duty to regulate the legal profession in the state of Michigan, see Const 1963, art 6, § 5 and MCL 600.904, we created a governing body that operates as a court system reserved for attorney disciplinary matters, and which mirrors the ordinary trial and appellate system. See MCR 9.101 et seq. The attorney discipline system consists of a prosecutorial component (the Attorney Grievance Commission [AGC]), MCR 9.108; hearing panels composed of members who act as judges by conducting public, trial-like proceedings during which they receive evidence and after which they render any necessary discipline, MCR 9.111; and a review board (the ADB), *285 which fulfills the judge-like appellate function should an attorney dispute a disciplinary order of a hearing panel, MCR 9.110.
Notably, MCR 9.110(A) describes the authority we bestowed on the ADB as follows: “The Attorney Discipline Board is the adjudicative arm of the Supreme Court for discharge of its exclusive constitutional responsibility to supervise and discipline Michigan attorneys.” (Emphasis added.) The ADB is further charged with disciplining attorneys, MCR 9.110(E)(5), suspending and disbarring attorneys, MCR 9.110(E)(6), and reviewing the AGC’s final orders of discipline, MCR 9.110(E)(4).
It is indisputable, as Justice KELLY points out, that this Court is vested with authority to declare enactments unconstitutional. And it appears from the plain language of the court rule that we have delegated this power to the ADB. When we charged the AGC with “discharging our] constitutional responsibility,” we listed no restrictions in this delegation of power. And, importantly, it seems that had we intended to limit the delegation accordingly, we would have explicitly reserved that power unto ourselves when we undertook the task of delegating our constitutional power to another entity, which task was certainly not taken lightly.
Further, it makes little sense to charge the disciplinary board with carrying out this Court’s duties and requiring it to discipline attorneys, reinstate them, and review final orders of discipline and dismissal in an appellate function without the benefit of deciding constitutional issues raised in that process. We have certainly not restricted trial or appellate courts from declaring enactments unconstitutional, and such rulings are always subject to this Court’s review, just as are *286 decisions regarding attorney discipline. Moreover, the fact that we created the attorney disciplinary rules or that there are nonattorneys on the ADB is of no moment — this Court remains the final authority on any action the ADB takes, and we can overturn any of its decisions we perceive as erroneous.
In carrying out its duties, and to render a just and complete decision, it is only logical that the ADB consider any and all arguments an attorney raises in his or her defense. And constitutional issues will inevitably be raised during the attorney disciplinary process. Petitioner’s assertion that the board can consider constitutional principles in its decision-making process, but is nonetheless restricted from finding a rule unconstitutional, is an odd one indeed. This would require our adjudicative arm, to which we gave full charge, to consider only half the question. This Court simply did not restrict the ADB in that way.
In any event, as already discussed, the board did not declare any rule unconstitutional. Rather, it merely considered the constitutional issues respondent raised and construed the rules narrowly in light of those principles, an exercise that the Grievance Administrator acknowledges is permitted. As the Sixth Circuit Court of Appeals has observed:
Even if the Board could not declare a Rule of Professional Conduct unconstitutional — a proposition about which we are not convinced — “it would seem an unusual doctrine, and one not supported by the cited case[s], to say that the [Board] could not construe [the Rules of Professional Conduct] in the light of federal constitutional principles.” Ohio Civil Rights Comm’n v. Dayton Christian Sch., 477 U.S. 619, 629, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986). The Board could, short of declaring a Rule unconstitutional, refuse to enforce it or, perhaps, narrowly construe it. [Fieger v Thomas, 74 F3d 740, 747 (CA 6, 1996).]
*287 Thus, the ADB’s actions were within its authority.
Moreover, for the reasons explained by Justice KELLY, the majority’s reliance on Wikman v Novi, 413 Mich 617; 322 NW2d 103 (1982), Lewis v Michigan, 464 Mich 781; 629 NW2d 868 (2001), and Const 1963, art 3, § 2 are entirely misplaced because none of those authorities compels the majority’s result.
Although, again, the question is not ripe, the majority errs in finding a restriction on the Court’s power to delegate constitutional power and in holding that the ADB cannot declare a rule of professional conduct unconstitutional. The majority proffers no persuasive authority to justify its holding. Rather, considering that this Court created the ADB, delegated to it the power to carry out our duty of maintaining discipline in the legal profession, and did not otherwise restrict its authority, it should logically follow that the ADB can both consider constitutional questions and declare a rule of professional conduct unconstitutional.
U. RESPONDENT’S SPEECH DID NOT VIOLATE THE RULES OF PROFESSIONAL CONDUCT UNDER WHICH HE WAS CHARGED
The lead opinion of the ADB correctly concluded that respondent’s public, out-of-court comments, made after the conclusion of the case about which he spoke, did not violate either Rule 3.5(c) or 6.5(a) of the Michigan Rules of Professional Conduct. The rules alleged to be violated simply do not prohibit the type of speech at issue in this case. The majority’s conclusions to the contrary are reached haphazardly and without any regard for the plain language, history, or context of the rules. In a melodramatic fashion, the majority misrepresents respondent as arguing that “there can be no courtesy or civility rules at all of this sort,” ante at 241, and the dissents as arguing for a “repudiation of ‘courtesy’ and *288 ‘civility’ rules,” ante at 264. Further, the majority loftily declares that the “respect for the wisdom of those who have preceded us in the judiciary in this country and the traditions of the legal process counsel that narrow and carefully tailored regulations of the sort set forth in MRPC 3.5(c) and MRPC 6.5(a) are necessary adjuncts to a responsible legal system,” ante at 241-242 (emphasis added), but then proceeds to interpret these rules with a brush so broad as to now encompass any offensive language used to criticize a judge. The majority’s troublesome expansion of those rules impermissibly silences harsh criticism of the judiciary about a concluded case, thus invading the purview of the First Amendment’s guarantee of the right to speak freely.
A. RESPONDENT DID NOT VIOLATE MRPC 3.5(c) BECAUSE HIS COMMENTS WERE NOT MADE “TOWARD THE TRIBUNAL’
MRPC 3.5(c) restrains attorneys from “engaging] in undignified or discourteous conduct toward the tribunal.” At the core of the arguments here is the interpretation of the phrase “toward the tribunal.” As is evident from the context of this rule, its historical evolution, and its plain language, this phrase pertains only to conduct that occurs in a tribunal or in the immediate environs of a tribunal, such as in judicial chambers.[2] Because respondent did not make his comments in that setting, but, rather, made them during a radio broadcast, he did not violate the rule.
While respondent does not appear to argue that his comments were particularly dignified or courteous, the crux of this rule is to prevent such comments in or in *289 the immediate environs of a tribunal, not at any time or in any space. In other words, conduct in or near a courtroom, such as conduct in judicial chambers or possibly comments made in pleadings filed with the court can be said to be conduct “toward” the tribunal. The majority’s removal of the proximate element of this rule does indeed result in “protecting the sensitivities of judges,” ante at 242, while at the same time raising grave constitutional implications by restricting a lawyer’s ability to speak outside the context of a judicial proceeding.[3] See part III of this opinion. Further, contrary to the majority’s assertion otherwise, such a broad expansion of the rule can and will preclude criticism of the “most robust character,” ante at 246, because it will prohibit attorneys from commenting on legal proceedings of which they have been a part. Notwithstanding the indisputable ability of this Court to prescribe ethical and disciplinary rules, see ante at 240-245, the majority’s myopic focus on what we are permitted to do in the abstract eclipses the more critical question whether this particular ethics rule was crafted to apply to this particular conduct.
MRPC 3.5(c) was designed, as is evident from the placement of the rule in the entire set of professional conduct rules, a historic examination of the rule, and the way the rule has been applied, to control the *290 conduct of attorneys in their interactions with the tribunal in their role as advocates for clients, not the conduct or speech of attorneys far removed from the tribunal and the advocatory process. The Michigan Rules of Professional Conduct are divided into eight chapters, each with a descriptive title. Within those chapters, each rule also has a descriptive heading. Notably, Rule 3.5(c) appears in chapter 3, entitled “Advocate,” and has a heading entitled “Impartiality and Decorum of the Tribunal.”[4] This arrangement is but the first indication that the rules within chapter 3 are meant to govern attorneys in their active role as advocates and that the rules within the subsections of Rule 3.5 are directed toward behavior that affects the decorum of the forum involved, which in turn connotes a required nexus between the conduct and the actual forum.
In keeping with that theme, the other two subsections of Rule 3.5 prohibit an attorney from seeking to influence judges, jurors, prospective jurors, or other officials, MRPC 3.5(a), and prohibit ex parte communications, MRPC 3.5(b). And the remaining provisions in chapter 3 governing the attorney as advocate clearly pertain to an attorney’s direct dealings with the court system and the dispensation of justice. Those rules are headed “Meritorious Claims and Contentions,” “Expediting Litigation,” “Candor Toward the Tribunal,” “Fairness to Opposing Party and Counsel,” “Trial Publicity,” “Lawyer as Witness,” “Special Responsibilities of a Prosecutor,” and “Advocate in Nonadjudicative Proceedings.” None of these rules, by its heading or its *291 content, purports to govern conduct that is unrelated to a potential or ongoing proceeding before a tribunal.
Importantly, the rules appearing in other chapters of the Michigan Rules of Professional Conduct do govern the conduct of attorneys outside of a tribunal. Specifically, chapter 8, “Maintaining The Integrity of the Profession,” contains two rules that are eminently more suited to curtailing the speech of attorneys outside the context of a legal proceeding than MRPC 3.5(c). For instance, MRPC 8.2(a) forbids an attorney from making “a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicative officer, or public legal officer, or of a candidate for election or appointment to judicial or legal office.” And MRPC 8.4, which sets forth the rules regarding “Misconduct,” expressly forbids attorneys from engaging in behavior “that is prejudicial to the administration of justice[.]” MRPC 8.4(c). It would be difficult to say that the broad sweep of MRPC 8.2 and 8.4 does not extend to conduct that shares no physical nexus with a tribunal. In fact, instances too numerous to mention here exist in which an attorney who acted questionably outside the context of a tribunal was charged with violating the rules of chapter 8, but, notably, not Rule 3.5(c). Clearly, then, comments about judges made outside the context of a tribunal are governed elsewhere in the rules, lending further credence to the conclusion that the more precise scope of Rule 3.5(c) encompasses only behavior in or in connection with a tribunal.
Moreover, the comment accompanying this rule sustains the conclusion that the rule is directed only toward conduct that occurs in the tribunal or in the *292 immediate environment of a tribunal.[5] The comment on MRPC 3.5 states as follows:
Many forms of improper influence upon a tribunal are proscribed by criminal law. Others are specified in the Michigan Code of Judicial Conduct, with which an advocate should be familiar.. ..
The advocate’s function is to present evidence and argument so that the cause may be decided according to law. Refraining from undignified or discourteous conduct is a corollary of the advocate’s right to speak on behalf of litigants. A lawyer may stand firm against abuse by a judge, but should avoid reciprocation; the judge’s default is no justification for similar dereliction by an advocate. An advocate can present the cause, protect the record for subsequent review, and preserve professional integrity by patient firmness no less effectively than by belligerence or theatrics.
Clearly, this comment envisions conduct in the context of tribunal proceedings. The comment speaks of “improperly] influencing a] tribunal,” “presenting] evidence and argument,” deciding a case, “speaking] on behalf of litigants,” “standing] firm against abuse by a judge,” “presenting] the cause,” “protecting] the record for . . . review,” and using patience in place of “belligerence” and “theatrics.” Each of these phrases is clearly connected with tribunal behavior or behavior with respect to an ongoing proceeding (see Rule 3.5[a], which governs improper influence, and Rule 3.5[b], which prohibits ex parte communication), and the comment does not refer to, and cannot be interpreted to govern, attorney conduct that occurs outside the context of a tribunal proceeding or the tribunal itself.
*293 Further, when interpreting MRPC 3.5(c), the rule’s genesis, which can be traced to the American Bar Association’s (ABA) former Model Code of Professional Responsibility Rule 7-106(0(6), is also instructive. That rule, tellingly titled “Trial Conduct,” provided that “[i]n appearing in his professional capacity before a tribunal, a lawyer shall not. . . [e]ngage in undignified or discourteous conduct which is degrading to a tribunal.” Our former disciplinary rule, DR 7-106(0(6), was identical. Subsequently, the ABA instituted its Model Rules of Professional Conduct, retaining the following concept from DR 7-106(0(6): “A lawyer shall not.. . engage in conduct intended to disrupt a tribunal.” ABA Model Rule 3.5(d).[6] We also replaced our former disciplinary code with rules of professional conduct, and our current MRPC 3.5(c) was fashioned from the new ABA rule as well as the corresponding former disciplinary rules. But despite minor wording changes to the rule, nothing about the current wording of the rule (“toward the tribunal”) nor its placement within the rules (under the “Advocate” chapter) suggests any intent of this Court to broaden the scope of the rule to situations beyond the context of tribunal proceedings.
As Justice Kelly explains, the revisions to MRPC 3.5(c), which deviated from the ABA’s revisions to its similar rule, merely eliminated the inquiry into an attorney’s intent that the ABA retained. Our rule instead focuses purely on whether the conduct can be said to be “undignified” or “discourteous,” without respect to whether the lawyer intended it to be so. But both our rule and the ABA’s rule contextually and textually preserved the condition that, to be punishable, *294 the conduct must occur in a tribunal or its immediate environs. The overwhelming contextual evidence of this nexus is the placement of both rules among other rules governing conduct in a tribunal or its environs and under chapter headings referring to the decorum of a tribunal. And the textual evidence of the nexus derives from the ABA’s language, “disrupt a tribunal,” and the Michigan rule’s language, “toward a tribunal.”
Of course, it is also important to remark that there has been no warning to the bar that the transformation of DR 7-106(0(6) into MRPC 3.5(c) allegedly served to extend the reach of the latter to conduct occurring outside a tribunal and removed from the active legal process. Although there is compelling evidence that the new rule was not, in fact, so extended, to the extent that any gray area exists, it is preferable to resolve the question most favorably to respondent. See State Bar Grievance Administrator v Corace, 390 Mich 419, 434; 213 NW2d 124 (1973). The inherent fairness of this approach not only is self-evident, but also serves to avoid any precarious trespass over the boundaries of the First Amendment by requiring notice of what type of conduct will be prohibited before punishing it.[7]
*295 Significantly, this Court has not had occasion to interpret MRPC 3.5(c) in its present form before today. Nor has research revealed any ethics opinions regarding this rule — save, critically, one. That ethics opinion involved this same respondent who found himself in quite the same situation as the present case. Fieger II, supra. There, it was claimed that respondent publicly made “knowingly false or reckless statements about various judges and a county prosecutor,” and he was likewise charged with violating MRPC 3.5(c), along with other rules. Both the hearing panel and the ADB refused to find that respondent’s statements violated Rule 3.5(c). The ADB agreed with the panel’s finding that Rule 3.5(c) is intended to govern only conduct directed to the tribunal in a pending matter. The panel had found that because respondent’s comments were made “about judges, and not to them in pending matters,” respondent had not violated the rule. The ADB agreed, concluding as follows:
We agree with the panel that the intent of the rule is to preserve the decorum of the tribunal so that proceedings may be conducted in an orderly fashion. Rude and undignified behavior can detract from the respect an adjudicator must possess in order to effectively manage a courtroom. *296 The rule is obviously directed at preventing proceedings from devolving into chaos because of lack of respect for the judge. [.Fieger II, supra at 31.]
Thus, respondent has already been subject to disciplinary proceedings for speaking out publicly in criticism of the judiciary. Yet he was explicitly absolved of the allegation that public comments about judges violated Rule 3.5(c) by both the hearing panel and the review board. And we denied the Grievance Administrator’s application for leave to appeal that decision. 469 Mich 1241 (2003).[8] Today, the majority abruptly changes the rule using a cursory and incomplete analysis that pays no heed to history, context, or even plain text. Those who admire the majority for its professed adherence to textualism may be surprised. Respondent probably will not be.
Under a scrupulous reading of the rule and the comment, and considering their evolution, there should be no other conclusion but that the rule governs only conduct that occurs in or near the tribunal in the context of litigation. Respondent’s comments, made during a radio broadcast, were not made in a tribunal, *297 near a tribunal, or in any context remotely related to the litigation process or the dispensation of justice. As such, just as respondent did not violate Rule 3.5(c) in Fieger II, he did not violate it in this case.
Justice KELLY also correctly points out the deficiency in the majority’s assertion that limiting the rule’s application to tribunal environs would make the rule “superfluous” in light of a trial court’s contempt powers. See ante at 252; MCL 600.1711(1). The most flagrant error in the majority’s assertion is its obliviousness to the fact that Rule 3.5(c) applies not just to courts and courtrooms, but to all tribunals. Only courts have contempt power. Thus, because not all “tribunals” have contempt power, the disciplinary rule is in no way duplicative of the contempt statute.
Moreover, MRPC 3.5(c), like the rule from which it was adopted, “carries with it the option of a disciplinary sanction as a supplement to the traditional power of judges to punish disruptive behavior as contempt of court.” Office of Disciplinary Counsel v Breiner, 89 Hawaii 167, 173; 969 P2d 1285 (1999) (emphasis added), citing 1 Hazard & Hodes, The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct, § 3.5:401 (2d ed). Further, because only a court has contempt powers, MRPC 3.5(c) provides an avenue for others who may be offended by an attorney’s conduct to seek redress by filing a grievance. And MRPC 3.5(c) allows the body charged with regulating attorney conduct to impose a far more consequential range of discipline on an attorney for violating the rule, from public censure to disbarment. Thus, the rule is in no way rendered “superfluous” by MCL 600.1711(1), and the majority’s contention otherwise is irrational.
And I, like Justice KELLY, dispute the majority’s assertion that construing MRPC 3.5(c) to limit its *298 application to tribunals “fails to accord consideration to the importance the courtesy and civility rules serve as a vehicle for preserving the public’s confidence in the integrity of the legal process.” See ante at 252. “[A]n enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect.” Bridges v California, 314 US 252, 270-271; 62 S Ct 190; 86 L Ed 192 (1941).
Read in its proper context, which the majority’s conclusory analysis fails to do, it is evident that MRPC 3.5(c) applies only to statements and conduct in a tribunal or its immediate environs. Had this Court intended its changes to this rule, which before indisputably governed conduct in a tribunal, to broadly expand the rule to prohibit statements about tribunals, it would have used the phrase “about a tribunal.” And, undoubtedly, such a broad expansion, with such weighty constitutional implications, would have been widely noticed, discussed within the bar, and probably challenged long before now. But this Court did not expand the rule in that manner, as is clear under any fair analysis. Such a change was not needed because other rules govern conduct that occurs elsewhere. Because respondent’s comments were far removed from the setting to which the rule applies, he did not violate it.
B. RESPONDENT DID NOT VIOLATE MRPC 6.5(a) BECAUSE HE DID NOT “TREAT” THE JUDGES WITH DISCOURTESY BY CRITICIZING THEIR DECISION
Respondent correctly contends that his conduct did not violate MRPC 6.5(a) because the rule does not apply to “a lawyer’s out-of-court, public criticism of the judiciary.” The rule states as follows:
*299 A lawyer shall treat with courtesy and respect all persons involved in the legal process. A lawyer shall take particular care to avoid treating such a person discourteously or disrespectfully because of the person’s race, gender, or other protected personal characteristic. To the extent possible, a lawyer shall require subordinate lawyers and nonlawyer assistants to provide such courteous and respectful treatment.
An issue similar to that discussed with respect to Rule 3.5(c) inheres in this rule. Specifically, just as Rule 3.5(c) contemplates conduct in a courtroom, Rule 6.5(a) is attendant to lawyers’ interactions with clients and others with whom the lawyer comes into contact in the course of the legal process. Both the comment to this rule, which illuminates the overarching principles behind the rule’s requirements, and the consistent way in which the rule has been applied, support this conclusion. In relevant part, the comment states:
A lawyer is an officer of the court who has sworn to uphold the federal and state constitutions, to proceed only by means that are truthful and honorable, and to avoid offensive personality. It follows that such a professional must treat clients and third persons with courtesy and respect. For many citizens, contact with a lawyer is the first or only contact with the legal system. Respect for law and for legal institutions is diminished whenever a lawyer neglects the obligation to treat persons properly. It is increased when the obligation is met.
A lawyer must pursue a client’s interests with diligence. This often requires the lawyer to frame questions and statements in bold and direct terms. The obligation to treat persons with courtesy and respect is not inconsistent with the lawyer’s right, where appropriate, to speak and write bluntly. Obviously, it is not possible to formulate a rule that will clearly divide what is properly challenging from what is impermissibly rude. A lawyer’s professional judgment must be employed here with care and discretion.
*300 A judge must act “[a]t all times” in a manner that promotes public confidence in the impartiality of the judiciary. Canon 2(B) of the Code of Judicial Conduct. See also Canon 5. By contrast, a lawyer’s private conduct is largely beyond the scope of these rules. See Rule 8.4. However, a lawyer’s private conduct should not cast doubt on the lawyer’s commitment to equal justice under the law. [Emphasis added.]
Again, it is clear from the comment that Rule 6.5(a) is circumscribed to an attorney’s treatment of persons with whom the attorney encounters in the legal process. This, of course, accords with the rule’s usage of the term “treat.” “Treat” means “[t]o act or behave in a specified manner toward.” The American Heritage Dictionary, New College Edition (1981). Just as respondent did not conduct himself “toward” the tribunal for purposes of Rule 3.5(c), he likewise did not conduct himself “toward” the tribunal for purposes of Rule 6.5(a). To hold otherwise contorts the plain meaning of the word “treat” and culminates in the curious conclusion that when a person speaks disrespectfully about another person outside that other person’s presence, the speaker is somehow “treating” that person in a certain manner.
Indeed, our disciplinary arm has sharply limited its application of the rule to instances of direct contact and has neither interpreted nor applied the rule in any other manner. Violations of the rule have been found only in instances of, for example, improper sexual conduct, Grievance Administrator v Neff, ADB No. 95-94-GA, notice of suspension issued April 30, 1996; Grievance Administrator v Bowman, ADB No. 95-95-GA, notice of reprimand issued January 3, 1996; Grievance Administrator v Childress, ADB No. 95-146-GA, notice of suspension issued December 6, 1996; Griev *301 anee Administrator v Childress, ADB Nos. 97-169-GA and 97-183-FA, notice of suspension issued June 9, 1998; Grievance Administrator v Williams, ADB No. 98-203-GA, notice of suspension issued February 1, 2000; Grievance Administrator v Gold, ADB No. 99-350-GA, opinion issued May 16, 2002; Grievance Administrator v Kohler, ADB No. 01-49-GA, notice of suspension issued December 10, 2001; physical altercations with opposing counsel, Grievance Administrator v Lakin, ADB No. 96-166-GA, notice of reprimand issued November 13,1997; Grievance Administrator v Golden, ADB No. 96-269-GA, opinion issued May 14, 1999; Grievance Administrator v McKeen, ADB No. 00-61-GA, opinion issued May 7, 2003; vulgar and profane comments that interfered with a deposition, Grievance Administrator v Farrell, ADB No. 95-244-GA, notice of reprimand issued December 3, 1996; and threatening statements made directly to another person, Grievance Administrator v Warren, ADB No. 01-16-GA, opinion issued October 2, 2003; Grievance Administrator v Sloan, ADB Nos. 98-106-GA and 98-176-GA, notice of suspension issued April 1, 1999. Further, in some instances in which the only conduct at issue was name-calling in the course of direct communication, the rule was found not to be violated. See, e.g., Grievance Administrator v Szabo, ADB No. 96-228-GA, opinion issued February 11, 1998; Grievance Administrator v MacDonald, ADB No. 00-4-GA, opinion issued January 25, 2001.
As the lead opinion of the ADB correctly observed:
MRPC 6.5(a), like MRPC 3.5(c), seems clearly to extend to discourtesy toward and disrespect of participants in the legal system when such conduct interferes or has the potential to interfere with the orderly administration of justice. To apply this rule in this case, we would have to hold that “treat” means to make comments about a person *302 outside their [sic] presence, after the conclusion of the proceedings. This would sweep in any comment critical of a participant’s role in the justice system even after that role had been concluded. In this country, many trials or other proceedings are subject to discussion and analysis after their conclusion. Nothing in Rule 6.5 suggests that “persons involved in the legal process” may not ever be criticized for their role in that process, not even after the involvement has ceased.
Nor is the majority’s treatise on our duty to oversee the legal profession and foster rules geared toward maintaining respect for the judiciary persuasive justification for the broad-reaching interpretation it adopts. As the United States Supreme Court has explained:
We recognize the importance of leaving States free to select their own bars, but it is equally important that the State not exercise this power in an arbitrary or discriminatory manner nor in such way as to impinge on the freedom of political expression or association. A bar composed of lawyers of good character is a worthy objective but it is unnecessary to sacrifice vital freedoms in order to obtain that goal. It is also important both to society and the bar itself that lawyers he unintimidated — free to think, speak, and act as members of an Independent Bar. [Konigsberg v State Bar of California, 353 US 252, 273; 77 S Ct 722; 1 L Ed 2d 810 (1957).]
Further, as we explained in In re Chmura, 461 Mich 517, 540; 608 NW2d 31 (2000), “the state’s interest in preserving public confidence in the judiciary does not support the sweeping restraints imposed by Canon 7(B)(1)(d).”[9] Likewise here, the directive of Rule 6.5(a) that attorneys must treat others involved in the legal *303 process with courtesy and respect cannot be interpreted as a sweeping restraint on attorney comment regarding concluded cases.
Reading the rule in its proper context and affording the term “treat” its common and ordinary meaning, it is again clear that respondent, by his comments, did not “treat” anyone involved in the legal process. Rather, his comments were permitted public criticism of Court of Appeals judges. Just as is the case with Rule 3.5(c), an interpretation of this rule that enlarges the realm of sanction to public criticism unrelated to the process of administering justice treads dangerously in the waters of the First Amendment’s protections of free speech. Respondent’s speech was not prohibited by Rule 6.5(a) and cannot be found to have violated it.
C. RESPONDENT’S COMMENTS DID NOT PERTAIN TO A PENDING CASE, FURTHER DIMINISHING ANY JUSTIFICATION FOR EXPANDING RULES 3.5(c) AND 6.5(a) BEYOND THEIR INTENDED MEANINGS
The majority observes that restraints on speech can be more encompassing if the speech pertains to an ongoing matter. See ante at 247; Gentile v State Bar of Nevada, 501 US 1030, 1070; 111 S Ct 2720; 115 L Ed 2d 888 (1991). It concludes that the matter about which respondent spoke (Badalamenti v William Beaumont Hosp-Troy, 237 Mich App 278; 602 NW2d 854 [1999]) was indeed pending and posits that this justified stricter curtailment of respondent’s right to speak publicly about it. Notwithstanding that the rules did not apply to respondent because they were not comments “toward” the tribunal and respondent did not “treat” the tribunal discourteously, the majority is quite misguided in concluding that the Badalamenti case was “pending.”
*304 As Justice Kelly observes, legal and lay dictionaries define “pending” in much the same way: “[r]emaining undecided; awaiting decision,” Black’s Law Dictionary (8th ed), and “awaiting decision or settlement.” Random House Webster’s College Dictionary (1997). Because of the similarity, it is unnecessary to determine whether the term “pending” has acquired a peculiar meaning in the law. The outcome is identical despite which dictionary is used. A “pending” matter is an undecided matter awaiting decision, which the Badalamenti case clearly was not.
The majority points to several court rules and, because they are inapplicable, engages in an exercise of lexical gymnastics to reach its erroneous conclusion. Specifically, the majority cites MCR 7.215(F)(1)(a), which explains when Court of Appeals opinions become “effective.” That rule states that an opinion becomes “effective after the expiration of the time for filing an application for leave to appeal to the Supreme Court, or, if such an application is filed, after the disposition of the case by the Supreme Court[.]” Notably, the rule does not use or define the term “pending” and is in no way referenced by or connected to the disciplinary rule at issue. As such, it is a poor source by which to interpret when a case might be “pending” for purposes of restricting attorney comment, particularly when the word’s common and legal meanings are flatly ignored.
Similarly unhelpful is the majority’s striving attempt to support its position by citing various other procedural rules, specifically MCR 7.302(C)(2)(a), (b), and (c), MCR 7.210(H), and MCR 7.317(C) and (D), that govern filing applications for leave to appeal to this Court and returning the record to the lower court. See ante at 248-249 & n 14. Of course, those rules say nothing about when a Court of Appeals opinion is either “effec *305 tive” or still pending. But more importantly, the majority fixates on our procedural mechanisms to the complete disregard of the constitutional framework within which the question must be examined. The bounds of free speech are not a function of procedural court rules, as discussed later. Rather, the inquiry must center on whether the type of harm sought to be prevented is imminent if the speech is not curtailed. When a record is returned to the lower court is completely irrelevant to a discussion regarding whether speech about a case can be silenced.
The majority also “reveals” that respondent ultimately moved for rehearing and for leave to appeal as if this were damning evidence of the pendency of the Badalamenti case. Ante at 249-250 & n 17. It is not. Nothing the majority points to, and nothing uncovered in an exhaustive jurisdictional search, supports the novel notion that speech can be restricted until the time when no further relief from a judgment can ever be sought.
Just as strangely, the majority states that the Badalamenti case was “ ‘begun, but not yet completed’ ” because the Court of Appeals, “by granting a motion for reconsideration or rehearing, could still have affected the substantial rights” of respondent’s client. Ante at 249. It farther opines that the case was still “awaiting rendition of a final judgment” because “Mr. Fieger filed an application for leave to appeal in this Court. . ..” Ante at 250 n 17. This is faulty logic at its core. When respondent made his statements, there was no motion for reconsideration. When respondent made his statements, the case was not “awaiting rendition of a final judgment” because respondent had not, in fact, filed an application for leave to appeal in this Court. It cannot be said any more simply: nothing that had begun lacked completion.
*306 Further, without support, the majority decides that the opposite of “pending” is “final.” Ante at 250 n 17. Proffering a purported antonym, with nothing more, to divine the meaning of a word is certainly a novel approach, but in any event, the attempted correlation does not withstand scrutiny because the court rules on which the majority relies explain when a judgment is “effective” and when the Court of Appeals should return the record to the lower court. The uncomplicated task the majority confounds is deciphering the meaning of the word “pending.” Rather than conduct a simple application of the plain meaning of the word to the facts at hand, the majority circumscribes its assessment of the word “pending” to unrelated court rules, shortshrifting respondent — and any other attorney who wishes to engage his or her right to free speech — and resulting in a contorted analysis.
Further, while MCR 7.302 discusses applications for leave to appeal to this Court, it does not address when a trial court judgment, a matter from this Court, or a matter from any other judicial or administrative agency is “pending.” And while the majority does not assert that MRPC 3.5(c) curtails only speech about Court of Appeals opinions, its analysis regarding when a Court of Appeals case is “pending,” which focuses only on when the judgment is “effective,” fails to consider any potential incongruities that may arise with respect to when it is “safe” to speak about non-Court of Appeals cases. In other words, by failing to apply in a straightforward manner either the common or the legal meaning of “pending,” the majority allows for vastly different rules in similar scenarios. And, oddly, the majority suggests that a different rule may apply when a court has accepted a case on appeal. Ante at 248-249 & n 15. To suggest that a case is pending after a final judgment is rendered and while no motions for reconsideration or *307 appeal have been filed, but that it may not be pending after the case has been accepted on appeal, is counter-intuitive logic to say the least.
Last, it is paramount to observe that when an enactment threatens to encroach on a person’s constitutional guarantees, “ ‘every reasonable construction must be resorted to, in order to save [the enactment] from unconstitutionality.’ ” Edward J DeBartolo Corp v Florida Gulf Coast Bldg & Constr Trades Council, 485 US 568, 575; 108 S Ct 1392; 99 L Ed 2d 645 (1988), quoting Hooper v California, 155 US 648, 657; 15 S Ct 207; 39 L Ed 297 (1895). Interpreting the word “pending” in a way that restricts respondent’s First Amendment guarantees and casts constitutional doubt on the conduct rule is contrary to this “cardinal principle” of construction. Id. Faced with alternative ways to construe when a case is “pending,” this Court is obligated to choose the interpretation that poses the least danger of silencing speech. See part III of this opinion. This the majority fails to do.
Were the meaning of “pending” given proper import here, rather than being contorted or ignored, it would be plain that a matter that has been decided by the Court of Appeals is no longer “pending.” As such, the majority’s analysis is incomplete and, ultimately, incorrect. Given the proper construction, which includes accounting for the constitutional implications, it is evident that the Badalamenti case was not “pending” when respondent spoke publicly about it. Thus, the majority not only unjustifiably expands the meaning of the otherwise plain language of the rules at issue, it also compounds its error by misusing our authority to limit speech that pertains to a pending case because the case was not, in fact, pending.
*308 III. RESPONDENT’S POLITICAL COMMENTS WERE PROTECTED BY THE FIRST AMENDMENT RIGHT TO FREE SPEECH
“There is no question that speech critical of the exercise of the State’s power lies at the very center of the First Amendment.” Gentile, supra at 1034. This case, like Gentile, involves “classic political speech.” Id. The incorrectness of the majority’s assertion otherwise is easily exposed. Tellingly, the majority purports to acknowledge respondent’s argument that he engaged in “political” speech, but it then proceeds to totally misunderstand the nature of political speech and disregard the entire body of law pertaining to it. By this paucity of reasoning, the majority completely guts the First Amendment and renders an alarming — and, no doubt, singular — holding that speech critical of public officials is prohibited unless the public official is facing reelection at the time the speech is made[10] or the speech uttered is palatable to the majority’s sense of civility. Neither precept can be found in our First Amendment jurisprudence.
To provide the needed jurisprudential background the majority omits, political speech protection encompasses not only statements about current electoral candidates, but extends to all “expression of editorial opinion on matters of public importance ....” FCC v League of Women Voters of California, 468 US 364, 375; 104 S Ct 3106; 82 L Ed 278 (1984). “ ‘Whatever differ *309 enees may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs.’ ” Burson v Freeman, 504 US 191, 196; 112 S Ct 1846; 119 L Ed 2d 5 (1992), quoting Mills v Alabama, 384 US 214, 218; 86 S Ct 1434; 16 L Ed 2d (1966). Respondent’s comments fall easily into this closely protected category of speech: he made critical statements about what he perceived as an errant decision that unjustly divested his seriously injured client of a jury verdict. The judges who overturned the jury verdict were, of course, part of our judicial system, which “play[s] a vital part in a democratic state” and in which “the public has a legitimate interest in [the] operation[].” Gentile, supra at 1035.
“[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.” Garrison v Louisiana, 379 US 64, 74-75; 85 S Ct 209; 13 L Ed 2d 125 (1964). Thus, the United States Supreme Court has “repeatedly explained [that] communication of this kind is entitled to the most exacting degree of First Amendment protection.” League of Women Voters, supra at 375-376. Stated another way, political speech “occupies the ‘highest rung of the hierarchy of First Amendment values,’ and is entitled to special protection.” Connick v Myers, 461 US 138, 145; 103 S Ct 1684; 75 L Ed 2d 708 (1983), quoting NAACP v Claiborne Hardware Co, 458 US 886, 913; 102 S Ct 3409; 73 L Ed 2d 1215 (1982). Thus, when a government ventures into the perilous realm of restricting political speech, it must produce evidence of a state interest so significant that it fully justifies the otherwise forbidden endeavor of silencing those who desire to publicly find fault with the way in which the government conducts its affairs. See Bridges, supra at 270-271. Moreover, the government must show that the rule is so narrowly tailored that *310 there is no unnecessary interference with First Amendment freedom. Sable Communications of California, Inc v FCC, 492 US 115, 126; 109 S Ct 2829; 106 L Ed 2d 93 (1989). Rules inhibiting unhampered comment, thus shackling the right to freely express opinion, must be justified, “[i]f they can be justified at all,... in terms of some serious substantive evil which they are designed to avert.” Bridges, supra at 270 (emphasis added); see also id. at 262 (“[T]he likelihood, however great, that a substantive evil will result cannot alone justify a restriction upon freedom of speech or the press.”). And protecting the judiciary or other public actors from derision, however crudely or distastefully expressed, has consistently been rejected as a “serious substantive evil” that would justify restrictions on speech.
The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one’s mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect. [Id. at 270-271.]
Consider also the following:
More fundamentally, although the State undoubtedly has a substantial interest in ensuring that its attorneys behave with dignity and decorum in the courtroom, we are unsure that the State’s desire that attorneys maintain their dignity in their communications with the public is an interest substantial enough to justify the abridgment of their First Amendment rights. Even if that were the case, we are unpersuaded that undignified behavior would tend to recur so often as to warrant a prophylactic rule. [Zaud *311 erer v Office of Disciplinary Counsel of the Ohio Supreme Court, 471 US 626, 647-648; 105 S Ct 2265; 85 L Ed 2d 652 (1985).]
Rather, restrictions on public comment in this context have normally been validated only when the voicing of opinion threatens to wreak serious prejudice on the orderly administration of justice. See Bridges, supra at 271. And even then the right to speak is closely guarded. The case must be pending, and comment about it cannot be suppressed unless the “substantive evil of unfair administration of justice” is a “likely consequence” or punished unless “the degree of likelihood was sufficient to justify summary punishment.” Id. (emphasis added). And again, once an interest is validated, a substantive evil is identified, and the substantive evil is found to be a likely consequence,
[t]he Government may serve this legitimate interest, but to withstand constitutional scrutiny, “it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms.” It is not enough to show that the Government’s ends are compelling; the means must be carefully tailored to achieve those ends.” [Sable Communications, supra at 126 (citations omitted).]
Significantly, the majority omits any meaningful discussion regarding whether the rules it interprets to encompass respondent’s conduct were narrowly tailored, stating in conclusory fashion only that the rules are narrowly drawn. See ante at 261.
Critically, again, the determination whether a case is pending cannot be conducted without affording serious weight to the constitutional principles involved. In this sense, a rule restricting speech that is questionable in the constitutional respects of vagueness or overbreadth can be interpreted in such a manner that it upholds the *312 rule as a whole but nonetheless declares it inapplicable to particular conduct. See n 7 of this opinion. This, of course, is precisely what the ADB’s lead opinion accomplished. It interpreted the rules narrowly in light of governing constitutional principles to avoid invalidating them completely. Allowing constitutional principles to guide and inform the analysis is yet another undertaking the majority neglects in its opinion.
In addition to what has already been stated in part 11(C) of this opinion, in determining whether a case is pending in light of the constitutional right to speak freely, it is informative to examine Justice Frankfurter’s words written in dissent to the majority’s finding that the speech in Bridges, which occurred between trial and sentencing, did not prejudice the administration of justice. While the majority did not conclude that the case was not pending, but, rather, that the speech did not pose a threat serious enough to the administration of justice to be punishable, Justice Frankfurter believed that the majority did not give proper accord to the status of the case, which, by any estimation, had not concluded. In his vigorous dissent, Justice Frankfurter distinguished cases that are no longer awaiting decision from those in which a decision has not yet been rendered:
The question concerning the narrow power we recognize always is — was there a real and substantial threat to the impartial decision by a court of a case actively pending before it? The threat must be close and direct; it must be directed towards a particular litigation. The litigation must be immediately pending. When a case is pending is not a technical, lawyer’s problem, but is to be determined by the substantial realities of the specific situation.[8] Danger of unbridled exercise of judicial power because of immunity from speech which is coercing is a figment of groundless fears. In addition to the internal censor of conscience, *313 professional standards, the judgment of fellow judges and the bar, the popular judgment exercised in elections, the power of appellate courts, including this Court, there is the corrective power of the press and of public comment free to assert itself fully immediately upon completion of judicial conduct. Because courts, like other agencies, may at times exercise power arbitrarily and have done so, resort to this Court is open to determine whether, under the guise of protecting impartiality in specific litigation, encroachments have been made upon the liberties of speech and press.
{Bridges, supra at 303-304 (Frankfurter, J., dissenting) (emphasis added).][11]
As is clear from these statements, there is much more to consider than a court rule governing when a Court of *314 Appeals case becomes “effective” before a case, in furtherance of speech restrictions, can be declared “pending.” It is the practical nature of the proceedings to be given due accord, not the hypertechnicality of an unrelated court rule. It is whether speech has true potential to influence the manner in which justice is dispensed, not whether in some abstract sense a decided case is temporarily limited from having full effect.
Applying these precepts, as the majority fails to do, the Kansas Supreme Court determined that an attorney’s comments to a reporter, made in the afternoon on November 7, 1970, and printed on November 8, 1970, about a decision issued on November 7, 1970, were not made about a pending case. Kansas v Nelson, 210 Kan 637; 504 P2d 211 (1972). The court reasoned: “Since our decision on November 7, 1970, terminated the case referred to by respondent in his interview, we do not believe a violation of DR 1-102(A)(5)[12] is clearly shown.... Since the case was terminated, respondent’s statements can not serve as harassment or intimidation for the purpose of influencing a decision in the case involved.” Id. at 641 (citation omitted). Presumably, the Nelson respondent could have still moved for reconsideration. But the court did not fixate on the procedural technicalities; rather, it considered the real-world purpose of the rules proscribing speech and whether the speech, in that context, would have the potential to influence a pending case.
When the realistic, rather than abstract, concerns are heeded, as they must be in a constitutional analysis, it is acutely clear that the case about which respondent spoke was not pending. A verdict had been rendered, *315 appeal had been taken, and an appellate opinion had been written and released to the public. The case was not “immediately pending” or “actively pending.” See Bridges, supra at 303 (Frankfurter, J., dissenting). There was no “real and substantial” or “close and direct” threat to the impartial decision of the Court of Appeals. See id. What the majority fails to account for is that its new speech prohibition does nothing to actually accomplish what rules prohibiting public, out-of-court speech about pending matters are intended to do, i.e., prevent prejudice to the administration of justice. Stated another way:
Forbidden comment is generally such as may throw psychological weight into the scales which the judge is immediately balancing. Where the scales have already come to rest, the criticism is of that which the judge has seen fit to place on them to cause such balance, and hence has no effect upon the weighing of the elements of justice involved. [In re Bozorth, 38 NJ Super 184, 191; 118 A2d 430 (1955).]
The red herring the majority inserts into this case is that respondent was still entitled to move for reconsideration and to petition this Court for leave to appeal. As discussed in part 11(C) of this opinion, respondent had not so moved, so there was nothing at all left to be decided. It is of no consequence that respondent later invoked his client’s right to petition for further review. Respondent was entitled at the time he spoke to speak freely about the Badalamenti case. Not only was there no “serious substantive evil” at play, there simply was no risk at all of prejudicing the administration of justice. The scales of justice had come to rest. The majority’s failure to address whether the case was truly pending in light of the “substantial realities” of this specific situation is a disservice to members of the bar and, critically, takes an enormous bite out of the First Amendment.
*316 But even if one were to accept the majority’s precarious conclusion that the Badalamenti case was pending, its end result that the comments were not protected is irreconcilable with the basic truth that even restrictions on speech regarding pending cases merit the most careful scrutiny. Bridges, supra at 268-269. Protections for speech about pending cases are no less vital because pending cases are “likely to fall not only at a crucial time but upon the most important topics of discussion,” and “[n]o suggestion can be found in the Constitution that the freedom there guaranteed for speech and the press bears an inverse ratio to the timeliness and importance of the ideas seeking expression.” Id. Indeed, public interest in a pending matter and the importance of disseminating information in a timely manner are at a pinnacle while the matter is ongoing. Moreover, negating constitutional restraints on limiting speech about pending matters would disregard, at the expense of free speech, that cases, especially in today’s overburdened legal system, frequently remain unresolved for extended periods. See id. at 269. And attorneys, who stand in an unrivaled position of familiarity with the justice system’s complexities, “hold unique qualifications as a source of information about pending cases.” Gentile, supra at 1056. “ ‘Without publicity, all other checks [on the government’s conduct] are insufficient: in comparison of publicity, all other checks are of small account.’ ” Id. at 1035, quoting In re Oliver, 333 US 257, 271; 68 S Ct 499; 92 L Ed 682 (1948), which, in turn, had quoted 1 Bentham, Rationale of Judicial Evidence, p 524 (1827).
Not only does the public’s right to be informed of the workings of the judiciary transcend the judiciary’s right to shield itself from even the basest of criticisms, but the judiciary, upon which is conferred unique powers, significant influence, and considerable insulation, must *317 not be so shielded that the public is denied its right to temper this institution. As eloquently explained by Justice Frankfurter:
There have sometimes been martinets upon the bench as there have also been pompous wielders of authority who have used the paraphernalia of power in support of what they called their dignity. Therefore judges must be kept mindful of their limitations and of their ultimate public responsibility by a vigorous stream of criticism expressed with candor however blunt. [Bridges, supra at 289 (Frankfurter, J., dissenting).]
Further, it is paramount to stress, when assessing the danger of prejudicing justice by speaking about pending matters, that “neither ‘inherent tendency’ nor ‘reasonable tendency’ [to prejudice the administration of justice] is enough to justify a restriction of free expression.” Id. at 273 (majority opinion). Nor is it enough to merely assert a substantial likelihood of causing material prejudice; rather, the disciplinary board or reviewing court must put forth credible evidence of such a threat. See Gentile, supra at 1038. In Bridges, the petitioners were accused of threatening the orderly administration of justice by publishing comments before an upcoming sentencing that criticized the possible outcome of probation. See Bridges, supra at 272 n 17, 274 n 19. The strongly worded editorials were replete with frightening descriptions of the defendants that seemed to be designed to instill fear in the public and intimidate the sentencing judge into imprisoning the defendants. Id. In deciding that the comments merited First Amendment protection and responding to the state’s argument that the comments threatened to prejudice the administration of justice, the Court duly noted that given the petitioner’s stance on labor issues in the past, it would be “inconceivable that any judge in Los Angeles would expect anything but adverse criti *318 cism from it in the event probation were granted.” Id. at 273. The Court held, “To regard it, therefore, as in itself of substantial influence upon the course of justice would be to impute to judges a lack of firmness, wisdom, or honor,— which we cannot accept as a major premise.” Id.
It is no small irony that the same could be said about this respondent and his comments. Respondent is no stranger to the disciplinary system, although not once have his comments been found punishable until today, and respondent is likely quite accustomed to accusations that he attempts to unfairly influence trial proceedings by his disposition as an advocate. See, e.g., Gilbert v DaimlerChrysler Corp, 470 Mich 749, 777-778; 685 NW2d 391 (2004). Indeed, respondent has many times been the target of criticism by members of this very majority. See id.; see also Justice Weaver’s dissent in this case. To now opine that respondent’s unsurprising response to losing a jury verdict on appeal was prejudicial to the administration of justice fails to account for both his well-known “long-continued militancy” in the field of litigation for injured plaintiffs and the “firmness, wisdom, or honor” of the judges about whom he speaks. Bridges, supra at 273.[13]
With the majority’s attempt to maintain that the Badalamenti case was pending discredited, and any *319 potential assertion that respondent’s conduct prejudiced justice that had already been administered, or, in the alternative, influenced either the Court of Appeals decision on the motion for reconsideration or this Court’s decision on the application for leave to appeal, discarded as implausible, the only remaining justification asserted for punishing respondent is that his remarks engendered public disrespect for the judiciary. While it can hardly be argued either that this Court does not have the authority to foster rules of professional conduct or that there is not legitimacy to the proffered state interest of protecting the integrity of the judiciary, the majority’s feverish invocation of these principles again overshadows the pivotal question involved in this case: Does application of the rules in question to the conduct in question infringe the guarantees of the First Amendment when the justification for punishing the conduct is the protection of the judiciary?
Several aspects of the majority’s characterization of the interest at issue must be noted. For instance, in one portion of its opinion, the majority states that we have an interest in a system “in which the public is not misled by name-calling and vulgarities from lawyers who are held to have special knowledge of the courts....” Ante at 242. I find this statement to be presumptuous and insulting to the intellect of our citizenry. The majority must believe that our citizens, unable to think for themselves and unable to engage in critical thinking when faced with divergent viewpoints, need the state to protect them from what the majority perceives may mislead them.[14] The majority thus makes a frightening judgment that speech itself is inherently *320 misleading, and, as such, it elevates some misguided sense of protectionism over the constitutional right of free speech.
The majority also presumes that a process in which it is assured that judges can “mete out evenhanded decisions” without being “undermined by the fear of vulgar characterizations of their actions” is a desirable goal that overrides First Amendment rights. Ante at 242. This view is a sad and, presumably, misguided commentary on the ability of our judges to elevate their duties over their feelings and to maintain neutrality in the face of inevitable criticism. The majority discounts that “judges must have thick skins and do not require protection from criticism unless there is malicious defamation.” In re Westfall, 808 SW2d 829, 845 (Mo, 1991) (Blackmar, C.J., dissenting), citing Bridges, supra, Pennekamp v Florida, 328 US 331; 66 S Ct 1029; 90 L Ed 1295 (1946), and Craig v Harney, 331 US 367; 67 S Ct 1249; 91 L Ed 1546 (1947). As the ADB lead opinion in this case recognized, “It is fair to say that judges, particularly appellate judges, will not be swayed by a lawyer’s brickbats.”
Even the Michigan Code of Judicial Conduct, by which the judiciary is governed and which we swear to *321 honor, alerts us that this institution is not a self-serving one designed for our protection, but exists for the people of this state. “A judge should always be aware that the judicial system is for the benefit of the litigant and the public, not the judiciary.” Code of Judicial Conduct, Canon 1. And Canon 2 provides fair warning that “[a] judge must expect to be the subject of constant public scrutiny.” Code of Judicial Conduct, Canon 2(A).
Although the majority purports to recognize that “lawyers have an unquestioned right to criticize the acts of courts and judges,” and that “there is no prohibition on a lawyer engaging in such criticism even during the pendency of a case,” it nonetheless asserts that there exist “limitations ... on the form and manner of such criticism .. . .” Ante at 263. A systematic review of the majority’s sources dismantles its broad claim and reveals its holding for what it truly is: an attorney cannot use choice language to criticize a judge, ever.
Of particular note are the majority’s citations for this proposition. In misleading fashion, the majority states the following:
In discussing the scope of this obligation in the 19th century, the United States Supreme Court stated that attorneys are under an implied “obligation ... to maintain at all times the respect due to courts of justice and judicial officers. This obligation ... includes abstaining out of court from all insulting language and offensive conduct toward the judges personally for their judicial acts.” [Ante at 244, quoting Bradley v Fisher, 80 US (13 Wall) 335, 355; 20 L Ed 646 (1872).]
Even a cursory reading of Bradley reveals three important facts. First, the attorney in Bradley criticized the judge in the courtroom in the context of litigation. Second, the entire Bradley opinion was devoted to *322 whether the judge, who thereafter struck the attorney from the rolls, was entitled to immunity for that act. Third, the statement the majority quotes was quintessential dicta; the Court decided that the judge was entitled to absolute immunity for his act, and, thus, no commentary on the attorney’s behavior was necessary or relevant to the holding. See id. at 357 (Davis, J., dissenting).
Tellingly, the proposition the majority extracts from Bradley has never been tested in the constitutional framework of an ethical rule that purports to prohibit rude speech that lacks a defamatory component made about judges after a case has concluded. To rely on such a statement for the sweepingly broad proposition that attorneys cannot utter rude remarks in that situation is misleading at best.
Of similar precariousness is the majority’s citation of In re Mains, 121 Mich 603; 80 NW 714 (1899). Although the majority again attempts to fashion a broad rule by isolating a comment, a quick glance at Mains exposes the majority’s loose methodology. The majority cites Mains for the proposition that “an attorney has no right to so conduct himself or herself as to dishonor his or her profession or to bring the courts of this state into disrepute.” Ante at 262 n 31. This Court in Mains considered an attorney’s accusations, made in letters to a judge, that the judge was engaging in corruption and conspiracy. Thus, this Court did not test the statement cited by the majority in the context of out-of-court, nondefamatory criticisms of the judiciary outside the context of pending litigation.
The same is true for the majority’s citation of In re Thatcher, 80 Ohio St 492, 669; 89 NE 39 (1909). That opinion was written before the state’s rules of professional conduct had been established, see In re Harper, *323 77 Ohio St 3d 211 225; 673 NE2d 1253 (1996), and, thus, is an insufficient test of whether the broad concept that an attorney should be respectful of the judiciary can be codified as a speech restriction and survive First Amendment scrutiny. But in any event, the respondent in Thatcher publicly asserted that a particular judge could be bought for the right price, so the speech at issue there was defamatory rather than merely rude criticism.
The majority repeats its error in citing Attorney General v Nelson, 263 Mich 686, 701; 249 NW 439 (1933). See ante at 263. The majority again attempts to draw unbelievably broad concepts from a vastly distinguishable situation. In Nelson, it took this Court 12 pages to catalog the conduct at issue, which consisted of, to be brief, an attorney making accusations in pleadings, petitions, and circulated letters that a judge and other attorneys were extensively abusing the legal process. So again, when this Court stated that an attorney “should be at all times imbued with the respect which he owes to the court before whom he is practicing,” Nelson, supra at 701, we in no way issued a blanket statement from which a rule that an attorney must not ever speak rudely of a judge can be derived.
In the same searching method, the majority cites Cantwell v Connecticut, 310 US 296; 60 S Ct 900; 84 L Ed 1213 (1940), in claiming that respondent’s comments, because of their graphic content, were not political speech because “ ‘[r]esort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution ....’” Ante at 256-257, quoting Cantwell, supra at 309-310. The reader should first be informed that Cantwell was not a case involving political speech. Rather, the Cantwell plaintiffs were engaged in reli *324 gious proselytizing, and one plaintiff was accused of breaching the peace by communicating propaganda that criticized the religion of others. The majority takes its chosen quote completely out of context. No more need be said than reproducing the full words of the Court on the subject:
Cantwell’s conduct, in the view of the court below, considered apart from the effect of his communication upon his hearers, did not amount to a breach of the peace. One may, however, be guilty of the offense if he commit acts or make statements likely to provoke violence and disturbance of good order, even though no such eventuality be intended. Decisions to this effect are many, but examination discloses that, in practically all, the provocative language which was held to amount to a breach of the peace consisted of profane, indecent, or abusive remarks directed to the person of the hearer. Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument. {Id. at 309-310.]
Likewise useless is the majority’s reliance on Chaplinsky v New Hampshire, 315 US 568; 62 S Ct 766; 86 L Ed 1031 (1942). Chaplinsky also involved the dissemination of religious ideas that offended the listeners. Further, Chaplinsky concerned itself with “fighting words” and held that the statute at issue was sufficiently narrowly tailored so as to prevent only “specific conduct lying within the domain of state power, the use in a public place of words likely to cause a breach of the peace.” Id. at 573.
One can only surmise that it must be this clear misunderstanding of Cantwell and Chaplinsky that prompts the majority to make the following conclusion: “There is no reasonable construction of Mr. Fieger’s remarks that could lead to the conclusion that these *325 were mere comment on the professional performance of these three judges of the Court of Appeals.” Ante at 261 (emphasis added). Even accepting the majority’s subjective assessment that respondent’s remarks were not “comment” on the judges’ performance,[15] the majority has failed remarkably to provide any sound citation of authority that would support its assertion that an attorney is precluded from uttering remarks that are something other than “comment” on a judge’s performance, or, for that matter, rude comment about a judge not made in the context of truly pending litigation.
Notwithstanding the majority’s failure to connect the rules at issue with respondent’s conduct and its inability to base in any law a blanket curtailment on offensively worded criticism, the majority astoundingly opines that a conception of the First Amendment that protects offensive attorney speech “has never been a part of our actual Constitution... .” Ante at 242. In fact, its “glimpse into the likely future” footnote, ante at 265 n 35, is nothing more than a scare tactic designed to conceal the fact that the ADB’s decision merely maintained the status quo and did not, in fact, “usher” some “Hobbesian legal culture” into our jurisprudence. See ante at 264. Stripped of irrelevant authority, the majority’s conclusion is nothing more than an unsupportable notion that attorneys must not speak in an undefined “rude” manner in criticism of a judge’s role in a concluded case.
For the reasons I have stated, I strongly disagree with the majority’s erroneous conclusion that respondent’s conduct is punishable for any of the reasons the majority asserts. Because, although the majority be *326 lieves otherwise, it is not enough to claim that the statements were crass, disgusting, or even discourteous and uncivil. Nor it is constitutionally sufficient to declare the rules of professional conduct violated, for “First Amendment protection survives even when the attorney violates a disciplinary rule he swore to obey when admitted to the practice of law.” Gentile, supra at 1054.[16] And it cannot be dispositive merely that an attorney is an “officer of the court” without some persuasive explanation of how his public statements are irreconcilable with that role. See id. at 1056. “ ‘[A] lawyer is a person and he too has a constitutional freedom of utterance and may exercise it to castigate courts and their administration of justice.’ ” Comm for Lawyer Discipline v Benton, 980 SW2d 425, 430 (Tex, 1998) (citations omitted). See also In re Ronwin, 136 Ariz 566, 573; 667 P2d 1281 (1983) (commenting that the respondent attorney had an “absolute” First Amendment right “to speak and write as he wishes and to say anything which he believes to be true,” but the right “must be exercised somewhere other than the courtroom”).
These ideas are far from novel, and a broad survey of this nation’s jurisprudence confirms that attorneys can publicly criticize the judiciary and cannot be punished for such speech, no matter how crass, when the criticisms do not affect the decorum of the tribunal or substantially prejudice the administration of justice. *327 Unless and until an unassailable connection can be made between respondent’s speech and prejudice to the administration of justice, which connection has not been made here, respondent’s comments, offensive as they may have been, cannot be suppressed or punished without seriously offending the First Amendment.[17]
The same can be said now as was said in Westfall, in which the dissent challenged the majority’s overly broad holding: “Make no mistake about it. The principal opinion chills lawyers’ speech about judicial decisions____This language portends further disciplinary proceedings against lawyers... who express themselves too freely. Many will conclude that it is wise to keep quiet.” Westfall, supra at 849 (Blackmar, C.J., dissenting.)
IV CONCLUSION
It is ridiculous to conclude, as does the majority, that respondent’s speech fell within the narrow bounds of the rules of professional conduct with which he was accused of violating. The majority’s holding is reached only by distorting the language of the rules and ignor *328 ing the fundamental guarantees of the First Amendment. Because respondent’s conduct was not governed by the rules in question, and because his right to freely criticize a decision rendered by elected members of the judiciary is safeguarded by both the United States and Michigan Constitutions, respondent merits no discipline. I would uphold the decision of the ADB and dismiss the complaint in its entirety.
WEAVER, J., concurred with Cavanagh, J.

 According to the majority, this is “tantamount” to declaring the rules unconstitutional. Ante at 239 n 6. This is a bizarre notion to say the least. A holding that the Constitution prohibits the board from punishing this respondent’s conduct is, of course, in no way an excoriation of the rules. Rather, the board simply found that the rules, interpreted in light of constitutional principles, could not he applied to this respondent’s conduct. The majority takes a severely contorted view of the ADB’s opinions to justify reaching this issue and, by doing so, troublesomely dilutes the doctrine of ripeness.

 A Texas court’s description is also useful. There, contemptuous behavior is not permitted “in open court, or at least while the court was actively pursuing the business of dispensing justice in its immediate environs.” In re Bell, 894 SW2d 119, 130 (Tex Spec Ct Rev, 1995).

 Out of the multiple entries under “toward” in a dictionary, the majority selects the two definitions that it perceives as useful to its conclusion. This ignores, first, that there are other definitions of “toward” that do not support its conclusion and, second, that there are a substantial number of other sources and considerations that assist us with determining the scope of the ethics rule at issue. Notably, the majority’s analysis unhelpfully ends with its selective citation of the first and fourth entries under “toward.” See ante at 251. Further, discriminating readers will recognize that the majority’s choice to use the definition “in the direction of” to support its conclusion is nothing but a truly strained application.

 For comparison purposes, the remaining chapters are “Client-Lawyer Relationship,” “Counselor,” “Transactions With Persons Other Than Clients,” “Law Firms and Associations,” “Public Service,” “Information About Legal Services,” and “Maintaining the Integrity of the Profession.”

 The comments on the Michigan Rules of Professional Conduct were written by Supreme Court staff and are an “aid to the reader” in determining the meaning of the rules. See Grievance Administrator v Deutch, 455 Mich 149, 164 n 15; 565 NW2d 369 (1997).

 The comment on the ADA’s rule is similar to that concerning our own rule, although it takes the additional step of explaining that conduct during a deposition is also regulated by the rule.

 Due process requires a person to have notice of conduct that is prohibited, and lack of notice can render an enactment unconstitutionally vague. See, e.g., United States v Wunsch, 84 F3d 1110, 1119 (CA 9, 1996) (declaring the term “offensive personality” too vague to inform a reasonable attorney what conduct will be sanctioned). The reader is referred to Justice Kelly’s dissent for a fuller explanation of vagueness. But rules of professional conduct that teeter on the edge of vagueness have been saved when it can be said that although the language would ordinarily be too vague to pass constitutional muster, it has been subject to enough interpretation that it provides the notice that is not inherent in the language itself. See, e.g., In re Frerichs, 238 NW2d 764 (Iowa, 1976); In re Beaver, 181 Wis 2d 12; 510 NW2d 129 (1994). See also Comm on Legal Ethics of the West Virginia State Bar v Douglas, 179 W Va 490; 370 SE2d 325 (1988). In Douglas, the court was faced with an attorney who posed for a newspaper photograph dressed as Rambo, complete with *295 bow and arrow, a knife, and ammunition, above a caption that read, “ ‘Just like Rambo I’ll defend against the judges alone if necessary.’ ” Id. at 492. In an article, he was quoted as saying, among other things, that the judges were “ ‘power-jockeying,’ ” that they “ ‘drew first blood,’ ” and “that he would ‘rise to the challenge.’ ” Id. The attorney also compared the ongoing trial proceeding to the Salem witch trials. Id. at 492 n 6. Afterward, he was charged with violating the disciplinary rule prohibiting conduct prejudicial to the administration of justice. Although the court recognized that this language had been routinely upheld as constitutionally sufficient, id. at 493, it reasoned that because the complexities of the subject had not been thoroughly analyzed in that state, neither the committee nor the parties had enough guidance to decide the matter, id. at 498. After providing that guidance, the court remanded the case for further consideration.

 As the majority points out, I concurred in the denial of leave, but wrote a statement to convey my belief that respondent’s remarks were at the edge of what types of remarks might merit sanction. It is important to note, however, that the statements in that case were allegedly libelous or slanderous, which calls for an entirely different analysis than the one required in this case. Comments with no hint of libel or slander, such as the ones at issue here, are in a different, and more protected, category of speech. Thus, I still believe that the order in that case should not be construed “as signaling any reduced interest on the part of this Court in upholding standards of professional civility ... .” See 469 Mich at 1241 (Cavanagh, J., concurring). However, the comments in this case, which cannot be remotely characterized as libel or slander, merit even more protection than those made in Fieger II. Thus, to the extent that I believed the statements in Fieger II were not sanctionable, that is all the more my belief in this case.

 That canon prohibited candidates for judicial office from using any form of communication that the candidate knew or reasonably should have known was false, fraudulent, misleading, or deceptive or that contained a misrepresentation, omitted certain facts, or created unjustified expectations.

 Because the majority suggests that respondent’s speech was not “campaign speech” because the judges about whom he spoke were not running for reelection, it might be helpful for it to explain exactly how close in time a person can speak uninhibitedly about an elected public official. Must the official be running in the year the comments are made? Must the official have already announced his candidacy? And what of appointed public officials who need not run in elections — are they always shielded from criticism because criticisms about them will always be made outside the context of a campaign?

 The present cases are very different from the situation that evoked dissent in Craig v. Hecht, 263 U.S. 255, 281[ 44 S Ct 103; 68 L Ed 293 (1923)]: “It is not enough that somebody may hereafter move to have something done. There was nothing then awaiting decision when the petitioner’s letter was published.” And see Glasgow Corporation v. Hedderwick & Sons (1918) Sess. Cas. 639. Compare State ex rel. Pulitzer Pub. Co v. Coleman, [347 Mo 1238] 152 S. W 2d 640 (Mo. 1941).

11 The Coleman court, referring to another case that recognized the power of a court to reinstate a case after a nolle prosequi, stated:
But this holding does not necessarily mean that after a case has been dismissed it is still to be considered pending during the entire term at which the order of dismissal was made within the meaning of the contempt rule above set out. ... To rule otherwise would be to narrow the limits of permissible criticism so greatly that the right to criticize would cease to have practical value. [Coleman, supra at 1261.]
The majority’s conclusion that the Badalamenti matter was pending until the time for filing an application for leave to appeal to this Court had expired very much divests the right to criticize of any practical value.

12 The referenced rule addressed conduct prejudicial to the administration of justice.

 This is certainly not to say that establishing oneself as a controversial, vocal proponent of a cause affords one license to engage in unfettered public criticism or invariably places one beyond reproach. Rather, this is simply to point out that it would be disingenuous, while being well-accustomed to respondent’s renowned crusade and the manner in which he furthers it, to then attempt to divest him of his First Amendment rights by claiming that the administration of justice is gravely prejudiced by his unsurprising rejoinders. Reasonably expected criticism does not — or should not — prejudice the administration of justice. See Bridges, supra at 273.

 Notably, such a view seems surprisingly inconsistent with the position recently taken by Justice Maekman in Michigan Civil Rights Initiative v Bd of State Canvassers, 475 Mich 903, 904 (2006) (Maekman, *320 J., concurring), in which he charged our citizens with the duty of informing themselves in the face of potential misrepresentations. Justice Markman stated:
In carrying out the responsibilities of self-government, “we the people” of Michigan are responsible for our own actions. In particular, when the citizen acts in what is essentially a legislative capacity by facilitating the enactment of a constitutional amendment, he cannot blame others when he signs a petition without knowing what it says. It is not to excuse misrepresentations, when they occur, to recognize nonetheless that it is the citizen’s duty to inform himself about the substance of a petition before signing it, precisely in order to combat potential misrepresentations. [Emphasis added.]

 Unlike the majority, most would probably conclude that respondent’s words were very clearly comment, however colorfully expressed, on how he believed the judges performed in deciding the Badalamenti appeal.

 This idea can he culled from a variety of United States Supreme Court opinions. See Westfall, supra at 844 (Blackmar, C.J., dissenting) (“Lawyers do not surrender their First Amendment rights when they accept their licenses.”), citing Bates v State Bar of Arizona, 433 US 350; 97 S Ct 2691; 53 L Ed 2d 810 (1977), In re RMJ, 455 US 191; 102 S Ct 929; 71 L Ed 2d 64 (1982), rev’g In re RMJ, 609 SW2d 411 (Mo, 1980), NAACP v Button, 371 US 415; 83 S Ct 328; 9 L Ed 2d 405 (1963), and In re Primus, 436 US 412; 98 S Ct 1893; 56 L Ed 2d 417 (1978).

 Because respondent’s comments neither violated the rules in question nor were subject to restrictions as substantially prejudicial or impermissibly damaging to the integrity of the judiciary, I would not reach the question whether the rules are constitutionally void for vagueness or overbreadth. When there are other legitimate ways to resolve an issue, as there are here, declaring the rules unconstitutional is unnecessary. Further, while I do not join in the fray between the majority and my colleague Justice Weaver, I take this opportunity to note that three alternate proposals, two of which have been crafted by this majority, regarding how this Court should handle disqualification motions have been languishing in this Court’s conference room for a substantial period of time. In the same way I will look forward to the dust settling from the case at bar, I will similarly anticipate this Court’s timely attention to the important matter of disqualification motions. I take my colleagues at their word that the issue of disqualification will be handled in a prompt manner in the coming months.